**COAST FEDERAL BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–466 C.

United States Court of Federal Claims.

Dec. 28, 2000.

Charles J. Cooper, Washington, DC, for plaintiff. Steven S. Rosenthal, Alan K. Palmer, and Michael W. Kirk, Washington, DC, of counsel.

John N. Kane, Jr., with whom were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Department of Justice, Washington, DC, for defendant. William C. Buckhold, F. Jefferson Hughes, William L.

Small, Edward Sullivan, and Jordan Thomas, of counsel.

### OPINION AND ORDER

HEWITT, Judge.

Plaintiff in this action seeks damages arising out of the passage of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) in 1989 and the resulting breach of its Assistance Agreement with the Federal Home Loan Bank Board (defendant or FHLBB). Plaintiff filed its original Complaint in this court on July 9, 1992, and moved for summary judgment as to liability on April 2, 1993. On June 3, 1993, the court stayed this and a number of related cases pending the resolution of *Winstar Corp. v. United States,* No. 90–8C, then on appeal before the Court of Appeals for the Federal Circuit. 979 F.2d 216 (1992). *Winstar* ultimately was appealed to the Supreme Court and was decided on July 1, 1996. 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Plaintiff renewed its Motion for Summary Judgment on October 29, 1996, and, in response, defendant conceded the existence of a contract between the parties and the breach of that contract. Defendant's Response to Plaintiff's Motion for Partial Summary Judgment Concerning Contract Issues, filed January 10, 1997, at 1–2. The court then granted summary judgment to plaintiff on liability. Order of March 23, 1998. Fact discovery and expert discovery on the issue of damages closed in April 2000.[1]

The matter is now before the court on cross-motions for summary judgment on damages and on defendant's Motion to Dismiss Counts II and III of the Complaint. The motions have been comprehensively briefed and argued.

Defendant contends that plaintiff sustained no damages as a result of the passage of FIRREA because the benefits of that legislation for plaintiff outweighed the added burdens on plaintiff. Defendant also argues that any damages claimed to have resulted from the breach are too speculative to recover or were not foreseeable at the time of contracting, and that, even if the damages claimed were foreseeable, defendant's breach was not a substantial causal factor in plaintiff's losses. Defendant's Motion for Summary Judgment (Def.Mot.).

Plaintiff argues that its damages were foreseeable to defendant at the time of contracting. Plaintiff defends its experts' approach to the calculation of damages and argues that its damages were caused by defendant's breach. Plaintiff contends that it did not benefit from the breaching act, and therefore that the damages it sustained as a result of the breach are not outweighed by the benefits it obtained. Plaintiff also argues that its damages can be shown with sufficient certainty to justify a ruling in its favor. Plaintiff's Corrected Opposition to Defendant's Motion for Summary Judgment on Damages and Motion to Dismiss, and Plaintiff's Cross–Motion for Partial Summary Judgment (Pl.Response).

The cross-motions for summary judgment also raise contract interpretation issues. Defendant argues that plaintiff has overstated its damages due to its assumptions about the accounting procedures required by the Assistance Agreement. Specifically, defendant argues that the amount of the cash contribution provided to plaintiff by the Federal Savings and Loan Insurance Corporation (FSLIC) was required to amortize for purposes of regulatory reporting requirements. Plaintiff disputes this interpretation and responds that the contract in fact permitted it to include the entire contribution as a permanent and nonamortizing credit for purposes of regulatory reporting.

Defendant's Motion to Dismiss (Def.Mot.Dism.) addresses plaintiff's claims for taking and violation of due process. Defendant argues that the takings claim must be dismissed for failure to state a claim, since rights created by a contract are not subject to takings claims, and that the due process claim is outside this court's jurisdiction. Plaintiff contends that contractually created rights may be the subject of takings claims,

---

1. The case was reassigned to Judge Hewitt on July 31, 2000 for the resolution of all remaining issues.

but acknowledges that its due process claim may not be brought in this court.

Plaintiff has also filed two Motions to Strike various documents from the Appendices to Defendant's Motion for Summary Judgment. Appendix A to this opinion addresses those Motions.[2]

For the following reasons, defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part, and plaintiff's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. Defendant's Motion to Dismiss is GRANTED.

## I. Background

Prior to 1989, federally chartered thrift institutions were regulated by FHLBB and insured by FSLIC, an arm of FHLBB. Plaintiff's Proposed Findings of Uncontroverted Fact (PPFUF) ¶¶ 2–3.[3] FHLBB was responsible for insuring that thrift institutions had sufficient capital to meet depositors' ordinary demands. *See* Complaint ¶ 4. FSLIC oversaw closures, mergers, and acquisitions of institutions that could not meet the capitalization requirements. *Id.*

When Central Savings and Loan (Central), a California-based thrift, appeared to be in danger of failure in the mid–1980s, FSLIC seized its assets and began encouraging other institutions to acquire Central. Defendant's Proposed Findings of Uncontroverted Facts (DPFUF) ¶ 1. FSLIC proposed a substantial cash contribution to any thrift that was willing to acquire Central. *Id.* ¶¶ 3–4. Plaintiff was one of several thrifts that submitted offers. *Id.* ¶ 5. FSLIC approved plaintiff's bid in March 1987. *Id.* ¶ 13.

FSLIC agreed to give plaintiff $299 million in cash. *Id.* ¶ 17. Plaintiff made no payment from its own funds. *Id.* ¶ 17. The parties signed an Assistance Agreement permitting plaintiff to credit FSLIC's cash contribution to its net worth and to count the contribution as regulatory capital.[4] Appendix to Defendant's Motion for Summary Judgment (Def.App.) v.1 at 512.[5]

In August of 1989, FIRREA was enacted. Complaint ¶ 59. FIRREA revised the regulatory reporting requirements applicable to thrifts. Complaint ¶¶ 59–60. Specifically, it replaced FHLBB with a new agency, the Office of Thrift Supervision (OTS), abolished FSLIC and assigned its functions to the Federal Deposit Insurance Corporation (FDIC), and required OTS to issue regulations establishing new capital ratios governing thrifts' reporting requirements. Complaint ¶¶ 3, 4, 59.

FIRREA created three categories of regulatory capital—tangible, core, and risk-based—and defined tangible and core capital as excluding "intangible" assets. 12 U.S.C. §§ 1464(t)(2)(A,C). Thrift institutions were required to maintain tangible capital at a ratio of at least 1.5 percent of total assets, and were required to maintain core capital at a ratio of at least 3 percent of total assets. *Id.* §§ 1464(t)(2)(A,B). FIRREA also provided, however, that certain institutions (those that were in compliance with all applicable statutes and regulations) could continue to include "qualifying supervisory goodwill" in core capital notwithstanding the exclusion of goodwill from core capital under section 1464(t)(9)(A), and permitted those institutions to phase out their inclusion of supervi-

---

**2.** Appendix A, including without limitation the Orders contained therein, shall be deemed incorporated in this Opinion and Order by reference.

**3.** The facts relied on in this opinion and cited to one of the parties' Proposed Findings of Uncontroverted Fact have not been disputed by the other party.

**4.** "Regulatory capital" refers to the amount of capital that thrifts were required to maintain. *Winstar Corp. v. United States,* 64 F.3d 1531, 1535 (Fed.Cir.1995) (en banc). Generally, the required amount of capital was a certain percentage of the thrift's total assets. *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64,

70 (1999), *appeal docketed,* No. 00–5027 (Fed.Cir. Dec. 3, 1999).

**5.** Defendant has included in its appendix many documents that are relevant to the disposition of this case, including the Assistance Agreement, expert reports for both sides, and plaintiff's financial reports. Rather than incorporating those documents into its own appendix, plaintiff has cited the documents as they appear in defendant's appendix. The court therefore occasionally refers to a document as supporting plaintiff's position even though it appears in defendant's appendix.

sory goodwill in core capital over a period of five years. *Id.* § 1464(t)(3)(A).

FIRREA defined "qualifying supervisory goodwill" as "supervisory goodwill existing on April 12, 1989, amortized on a straightline basis" over 20 years or the remaining amortization period, whichever was shorter. 12 U.S.C. § 1464(t)(9)(B). Regulations subsequently promulgated by OTS on December 7, 1989 explicitly included FSLIC capital contributions within the definition of supervisory goodwill. 12 C.F.R. § 567.1(w) (1990). The regulations incorporated FIRREA's five year phaseout schedule for core capital, and applied the same schedule to risk-based capital, since the calculation of the latter depended on what was included in the former. 12 C.F.R. § 567.2(a). FIRREA's treatment of qualifying supervisory goodwill, insofar as it negated the provision in the Assistance Agreement permitting plaintiff to report the difference between Central's assets and liabilities as regulatory capital, breached plaintiff's contract with the government. PPFUF ¶ 12.

Plaintiff initially complied with the new capital requirements, in part by exchanging convertible subordinated debentures for approximately $39 million in common stock in 1989, but it fell out of compliance with the risk-based capital requirement in the fourth quarter of 1990. DPFUF ¶¶ 63, 69. OTS conducted an examination of plaintiff in 1990 and gave it a composite rating of 4 (on a scale of 1–5, with 1 as the best rating and 5 as the worst), indicating "[m]ajor and serious problems or unsafe and unsound conditions . . . which are not being satisfactorily resolved." Def.App. v.3 at 2209–10. OTS identified problems including inadequate capital, poor asset quality, a lack of an effective internal asset review function, and overcompensated management. *Id.* at 2209. Plaintiff entered into a supervisory agreement with OTS on January 23, 1991. DPFUF ¶ 70. The supervisory agreement imposed growth restrictions on plaintiff and required it to file a capital plan with the OTS showing how plaintiff planned to return to regulatory compliance. *Id.* ¶ 71. Plaintiff returned to capital compliance in the first quarter of 1991 and remained in compliance thereafter. *Id.*

¶ 73. The supervisory agreement was rescinded in March of 1993. *Id.* ¶ 74.

## II. Discussion

### A. Summary Judgment

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The movant is entitled to summary judgment if the nonmovant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in favor of the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed. Cl. 450, 457 (1999).

### B. Duration of Plaintiff's Capital Credit

■ Plaintiff seeks expectancy damages. Def.App. v.1 at 164. Expectancy damages are available as a remedy for a breach of contract when the damages are reasonably foreseeable to the breaching party at the time of contracting, the breach is a substantial causal factor in the damages, and the damages are shown with reasonable certainty. *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1021–24 (Fed.Cir.1996); *Bluebonnet Savings Bank, FSB v. United States,* 47 Fed.Cl. 156, 167 (2000), *appeal docketed,* No. 00–5128 (Fed.Cir. Sept. 7, 2000). Plaintiff has proposed a scenario in which the breach is assumed not to have happened in order to measure those damages. Def.App. v.1 at 164. Specifically, plaintiff has calculated its damages as the difference between its actual performance and its anticipated performance. *Id.* The accuracy of the "no breach" scenario deter-

mines whether this court may accept the plaintiff's damages figure as reasonable.

Whether plaintiff's "no breach" model represents an accurate account of what would have happened absent the breach depends on whether the assumptions on which the model is based are valid. One assumption—based on an interpretation of the Assistance Agreement—that plaintiff's experts made in crafting their "no breach" model is that the capital contribution FSLIC made to plaintiff in connection with the acquisition of Central, and the associated forbearance, was permanent and nonamortizing. *Id.* at 221. Plaintiff contends that the contract gave plaintiff not only the right to credit the contribution toward regulatory capital but also the right to include it in regulatory capital in perpetuity without amortization. Pl. Response at 21–22. Defendant argues that the Assistance Agreement did not contemplate a permanent, nonamortizing capital credit but rather contemplated amortization in accordance with customary accounting practices. Def. Mot. at 87. Both parties have moved for summary judgment on this issue.

### 1. Background

When plaintiff acquired Central, Central's liabilities exceeded its assets by approximately $347 million. DPFUF ¶ 15. The then accepted practice in thrift accounting for an acquisition reported a negative gap between liabilities and assets as "goodwill." Def.App. v.2 at 1165. Absent a cash infusion of the type made by FSLIC in this case, the customary practice for the acquiring institution upon the acquisition would have been to report approximately $347 million in goodwill. Def.App. v.2 at 1165–66; *id.* at 1100. To help plug the hole between assets and liabilities, however, FSLIC gave plaintiff approximately $299 million in cash at the time of its acquisition of Central. DPFUF ¶¶ 10, 15. The cash infusion was itself also subject to a

specific customary accounting treatment. The Financial Accounting Standards Board (FASB) had issued a policy statement in 1982, known as Financial Accounting Standards Board Statement No. 72 (FASB 72), stating that goodwill created by an acquisition in which FSLIC makes a direct contribution to the acquiror is offset by the amount of such assistance. Def.App. v. 2 at 1101. Ordinarily, then, under FASB 72, plaintiff would have reported just $48 million in regulatory goodwill as an asset after its acquisition of Central. DPFUF ¶ 36.

Plaintiff requested and received special treatment, however, in its treatment of the cash contribution and the goodwill.[6] *Id.* ¶ 32. Specifically, plaintiff was granted the so-called SM–1 regulatory forbearance, which permitted it to book as a credit to net worth the entire gap between Central's assets and liabilities—$347 million—notwithstanding the $299 million in cash. *Id.* ¶¶ 32, 37, 41; *see also LaSalle Talman*, 45 Fed.Cl. at 70. The forbearance was set out in section 6(a)(1)(C) of the Assistance Agreement, which provided:

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, the cash contribution made under this § 6(a)(1) shall be credited to the [plaintiff's] net worth account and shall constitute regulatory capital. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from [FSLIC] that must be reflected in any filing that [plaintiff] may make, whether to the Bank Board or otherwise, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

---

**6.** When FHLBB solicited offers for the acquisition of Central, it included in its solicitation package Memorandum SP–37a, which described various standard regulatory forbearances. Def. App. v.1 at 389–404. The bidder was invited to request one or more forbearances from Memorandum SP–37a as part of its acquisition proposal. *Id.* at 383–84. Plaintiff requested that FSLIC assistance be credited directly to its net

worth, a forbearance listed on Memorandum SP–37a as SM–1. *Id.* at 351, 399. An internal FHLBB memorandum circulated two days before the Assistance Agreement was executed recommended that the forbearance be granted. *Id.* v.2 at 873–74, 881–82. The SM–1 forbearance was incorporated, almost verbatim, into the Assistance Agreement. *Id.* v.1 at 512–13.

Def.App. v.1 at 512–13. At the time, there were two separate systems of accounting that governed thrifts' reporting requirements: the Generally Accepted Accounting Principles system (GAAP), and the Regulatory Accounting Principles system (RAP). *United States v. Winstar Corp.*, 518 U.S. 839, 845–46, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Thrifts were ordinarily required to report their assets, liabilities, and regulatory capital to FHLBB under GAAP, but the SM–1 forbearance created an exception. Def.App. v.1 at 399. Under the SM–1 forbearance, plaintiff could report an additional $299 million in regulatory capital under RAP. DPFUF ¶¶ 40–41. Section 20 of the Assistance Agreement provided, however, that GAAP would otherwise govern plaintiff's reporting requirements:

*Accounting Principles.* Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.

*Id.* v.1 at 556. Section 20 also determined what authority governs in the case of ambiguous contract terms:

In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with [applicable FHLBB or FSLIC] regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement. If there is a conflict between such regulations and the Bank Board's res-

olution or action relating to the Acquisition or to this Agreement, the Bank Board's resolution or action shall govern.

*Id.* Finally, § 20 also clarified that ambiguities in the governing systems of accounting principles are subject to the interpretation of FHLBB:

For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants. Where there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern. Notwithstanding the foregoing, nothing in this § 20 shall affect the first sentence of the second paragraph in § 6(a)(1) of this Agreement.[7]

*Id.*

The foregoing provisions of the Assistance Agreement are the contract terms which bear on the question of what, if any, amortization period applies to the goodwill created by the SM–1 forbearance.

The amortization period for goodwill, the intangible asset created by a merger or acquisition under GAAP, was at one time governed by a document known as Accounting Principles Board Opinion No. 17 (APB 17), issued in August 1970, which set the amortization period at 40 years. Appendix to Coast's Response to the Government's Surreply (Pl.App.) v.7 at 3424–30. Securities and Exchange Commission (SEC) Accounting Bulletin No. 42A, issued in December 1985, limited the amortization of intangibles generally to 25 years. *Id.* at 3581–82. At the time of plaintiff's acquisition of Central it was FHLBB policy to follow the 25–year rule unless FASB 72 applied. *Id.;* Def.App. v.1

7. The "first sentence of the second paragraph" provided:

Within thirty (30) days of the receipt by [plaintiff] of the completed audit approved by [FSLIC] referred to in § 5(b), [FSLIC] shall wire transfer to [plaintiff] the amount, if any, by which [Central's] aggregate net operating loss for the period from October 1, 1986,

through the Effective Date as reflected by the audit exceeds the amount contributed by [FSLIC] pursuant to § 6(a)(1)(A)(iii) and (iv) above.

Def.App. v.1 at 511–12. This sentence is not relevant to the disposition of the amortization issue.

at 574–75; Plaintiff's Reply Brief in Support of its Cross–Motion for Partial Summary Judgment and Response to the Court's Request for Discussion of the Nature of the Government's Breach of Contract (Pl.Reply) at 54. FASB 72 provided that goodwill created by an acquisition amortizes over a period no greater than the estimated remaining life of the long-term interest-bearing assets acquired. Def.App. v.2 at 1100. Applying FASB 72 to plaintiff's assets would result in an amortization period of approximately 12.7 years. DPFUF ¶ 54.[8]

### 2. Contract Interpretation

Plaintiff and defendant offer competing interpretations of the Assistance Agreement. In plaintiff's view, FSLIC's $299 million capital contribution was outside the purview of FASB 72 altogether because FASB 72 deals only with GAAP, and the SM–1 forbearance was outside GAAP. Pl. Reply at 10–11. That the Assistance Agreement, under § 20, established that GAAP covered all accounting issues (except for the SM–1 forbearance) is irrelevant, in plaintiff's view, because the forbearance was itself outside GAAP. Id. at 11. The credit to plaintiff's regulatory capital cannot, under this view, be subject to GAAP's rules because GAAP "does not recognize" the creation of such a credit. Id. Plaintiff notes as well that it did not, in fact, amortize RAP goodwill in the two years between the acquisition of Central and the enactment of FIRREA, and argues that that history of nonamortization shows that the parties did not intend the amortization of RAP goodwill. Pl. Response at 27–29.

Defendant argues that "baseline regulatory policy compelled the filing of *all* financial statements with the FHLBB in accordance with GAAP unless a *specific* departure from GAAP was permitted." Def. Mot. at 22 (emphasis in original). Defendant contends that the effect of the SM–1 forbearance was solely

to permit plaintiff to record more regulatory capital than it could have otherwise, not to exempt goodwill from amortization. Id. at 23. Defendant acknowledges that plaintiff did not amortize RAP goodwill after the acquisition, but contends that the government's failure to draw attention to or correct the nonamortization represented an oversight rather than an agreement with plaintiff's position. Defendant's Reply Memorandum in Support of its Motions for Summary Judgment on Damages and to Dismiss, and in Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment (Def.Reply) at 36.

■ The starting point in contract interpretation is "the plain language of the agreement." *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed.Cir.1993). When the court construes a contract, it gives the words their "ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir.1998). Contract interpretations which do not give "reasonable meaning" to the entirety of the contract are disfavored. *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978).

■ The text of the Assistance Agreement favors defendant's interpretation. Plaintiff relies on the statement in § 6(a)(1)(C) that FSLIC's contribution "shall be credited to [plaintiff's] net worth account and shall constitute regulatory capital," arguing that the use of the phrases " 'shall be credited to' " and " 'shall constitute' " indicates permanence and nonamortization. Pl. Response at 22–23 (quoting Def.App. v.1 at 512). The phrase "shall be credited to" is certainly instructive as to the initial treatment of the FSLIC contribution, but, in the court's view, the phrase suggests nothing about the prop-

---

8. FASB 72 does not specify whether the proper amortization method of intangibles created by an acquisition is "straight line" or "level yield." The parties have not agreed on what treatment is proper. *See* Def. Mot. at 17 n. 5 (stating that defendant is still investigating which method applies); Coast's Response to the Government's Surreply (Pl.Surreply) at 10 (arguing that the level yield method applies). The court notes that

FIRREA itself defined "qualifying supervisory goodwill" as goodwill amortized under the straight-line method, suggesting that, if plaintiff's capital credit falls within the definition of supervisory goodwill, the straight-line rather than the level yield method applies. 12 U.S.C. § 1464(t)(9)(B). This issue has not been the focus of the briefing thus far, however, and the court does not decide it at this time.

er subsequent treatment of the amount initially credited. The phrase appears to the court to refer to an accounting entry to be made on a discrete occasion. Moreover, the phrase "shall constitute," while not on its face inconsistent with plaintiff's view of permanence, is fully consistent as well with amortization. It appears to the court more likely, indeed, that the phrase "shall constitute" conveys the agreement of defendant to an override of FASB 72's language directing that the amount of the assistance offset the goodwill created by the acquisition. Def. App. v.2 at 1101. Plaintiff can at most show that plaintiff itself viewed the agreement as precluding amortization. The plain language of the contract does not preclude amortization.

Moreover, the next sentence of the Assistance Agreement states unambiguously that GAAP governs the reporting of the contributions, which makes plaintiff's view that the contributions were unknown to GAAP implausible. Def.App. v.1 at 512–13. The text of the Assistance Agreement therefore immediately and directly contradicts the view that the phrases "shall be credited" and "shall constitute" indicate an agreement by defendant to special accounting treatment:

> [T]he preceding sentence is not intended to address in any way the accounting treatment of contributions from [FSLIC] that must be reflected in any filing that [plaintiff] may make, whether to the Bank Board

or otherwise, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

*Id.* Plaintiff's reports to FHLBB were governed by GAAP. DPFUF ¶ 44. The apparent purpose of this sentence in conjunction with the previous sentence, in the court's view, is to apply GAAP to the subsequent reporting of the capital contribution, as distinct from the initial "crediting" of the contribution to regulatory capital. To read the phrases "shall be credited" and "shall constitute" as affecting the subsequent accounting treatment of the capital contribution contradicts the plain language of the Assistance Agreement in the sentence immediately following.

In addition, the Assistance Agreement provides elsewhere that the government's interpretation will prevail in the event of an ambiguity or conflict. Section 20 of the Assistance Agreement states that it is governed by "the accounting principles and governing regulations ... in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board."[9] Def.App. v.1 at 556. The Assistance Agreement therefore contemplates that, when reporting requirements are unclear, FHLBB is entitled to issue clarifications or interpretations, and that plaintiff will be bound by FHLBB's views.[10] The Assistance Agreement then

---

**9.** Plaintiff argues that defendant has taken positions in other *Winstar*-related cases involving similar contract language that are inconsistent with its present position. Pl. Surreply at 18. Defendant contends that its position has been consistent. Defendant's Surreply Memorandum in Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment and in Support of its Motion for Summary Judgment on Damages (Def.Surreply) at 4 n. 1. In the suits that plaintiff mentions, defendant argued that the contracts left open the possibility of regulatory change because they did not explicitly address the thrifts' reporting requirements. *See* Appendix to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Pl.App.) v.6 at 3386, 3393. The *Winstar* plurality rejected that argument. *See* 518 U.S. at 865, 116 S.Ct. 2432 ("[T]he accounting principles clause tilts in favor of interpreting the contract to lock in the then-current regulatory treatment of supervisory goodwill."). Defendant has therefore abandoned its prior position and now takes a position consistent with the

*Winstar* plurality's decision. The court does not find plaintiff's argument persuasive.

**10.** Plaintiff argues that the necessary consequence of this deference to FHLBB's interpretation of the contract is that FHLBB had broad authority to rewrite the contract to suit itself. *See* Transcript of October 20, 2000 Oral Argument (Tr.) at 50–51. Interpretation and clarification are distinct from outright revision, however; had FHLBB declared after the execution of the contract that GAAP meant the opposite of what it had meant before, such a reversal would not be an interpretation or clarification. Moreover, the correspondence between FHLBB and Transohio Savings Bank, and FHLBB and Statesman Bank for Savings, indicates that it was not uncommon for FHLBB to issue binding interpretations of thrift reporting requirements under GAAP. Def. App. v.2 at 1115–16, 1130–31, 1138–54. It has already been established that this language did not give FHLBB broad power to reinterpret the

states that "[w]here there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern," indicating that, even if FASB 72 could be read as inconsistent with FHLBB's position, an inconsistency which the court does not find, FHLBB's interpretation of the contract would still prevail.[11] *Id.*

Since FHLBB was never requested to issue a statement to plaintiff explaining FHLBB's interpretation of GAAP on this issue, the court looks to other contemporaneous statements and actions by FHLBB to determine its interpretation.

### 3. FHLBB's Interpretation of GAAP

#### a. FHLBB's Statements

The evidence strongly supports the view that FHLBB consistently took the position that RAP goodwill must amortize. Two oth-

er institutions, Transohio Savings Bank and Statesman Bank for Savings, raised concerns about the amortization of RAP goodwill in correspondence with FHLBB in the period between the execution of plaintiff's Assistance Agreement and the passage of FIRREA. Def.App. v.2 at 1109–14, 1125–29.[12] FHLBB stated unequivocally to both of those institutions that goodwill created by FSLIC contributions must be amortized. *Id.* at 1108, 1115–16, 1124, 1130–31, 1149–51. Supervisory Agent Kurt Kreinbring wrote to Transohio on May 15, 1987, stating that Transohio had been "permitted ... to book the ... cash contribution from FSLIC as a direct credit to net worth," but that "[t]his ... departure from GAAP does not change the GAAP requirement that the amortization of goodwill must be charged to expense."[13] *Id.* at 1115–16. Supervisory Agent Steven L. Opsal wrote to Statesman on March 10, 1989,

contract in a way that rendered it meaningless. The *Winstar* plurality's treatment of the same clause found that FHLBB is bound by the regulations in force at the time of the contract, so any power to interpret ambiguous provisions was limited by existing regulations. 518 U.S. at 865–66, 116 S.Ct. 2432 (plurality opinion of Souter, J.). Likewise, in *California Federal v. United States,* 39 Fed.Cl. 753, 779 (1997), *appeal docketed,* No. 99–5119 (Fed. Cir. June 30, 1999), the court rejected the argument that, because the contract was subject to regulatory change, FIRREA did not breach the contract. The court stated that it "reject[ed] Defendant's argument that 'successor regulation' language shifted the risk from the government to [the plaintiff]." *Id.* There, adopting the government's argument would have meant that it was virtually impossible for FHLBB to breach the contract, since any change, even if explicitly contrary to the clearly expressed agreement of the parties, would be deemed within the contemplation of the "deference" clause. There is no such danger here, however, since the parties have already agreed that FIRREA and its implementing regulations breached plaintiff's contract. Even if plaintiff itself viewed the Assistance Agreement as precluding the amortization of goodwill, it is undisputed that there was no clear understanding between the parties regarding the permanence of the credit at the time of contracting. Therefore, FHLBB's subsequent interpretation of GAAP's requirements for the treatment of FSLIC assistance, as contemplated by the unambiguous text of the contract, did not overturn the parties' "expectations" in the sense discussed in *Winstar* and *California Federal.* The court's approach here is to give a reasonable meaning to the entirety of the contract while not ignoring defen-

dant's breach. *Arizona v. United States,* 575 F.2d at 863.

11. The deference given by contract to FHLBB's interpretation of accounting ambiguities means that plaintiff's invocation of the doctrine of *contra proferentem,* under which contracts are construed against the drafter, must fail. Pl. Reply at 51–52. There is nothing ambiguous about § 20's adoption of GAAP as interpreted by FHLBB; the only possible ambiguity lies in determining what FHLBB's interpretation was, a different question.

12. Plaintiff has moved to strike these documents as inadmissible hearsay, and the court has granted that motion insofar as the documents are offered for the truth of the matters contained therein. *See* Appendix A. The court relies on them in this discussion solely to show that Transohio and Statesman raised concerns about the proper accounting treatment of the SM–1 forbearance.

13. Plaintiff contends that the correspondence with Transohio was limited to the question of how to account for amortization, and did not address whether the amortization was required. Pl. Reply at 50. This is true; however, the government's communications to Transohio make clear that Transohio was not free to choose how it treated the reporting of its FSLIC assistance, even if its only deviation was to report amortization on one line rather than another. Def.App. v.2 at 1115–16. If Transohio was so constrained, it is true *a fortiori* that plaintiff was not free to choose to treat its RAP goodwill as a permanent and nonamortizing asset.

rejecting an argument that goodwill resulting from a FSLIC contribution should not amortize. *Id.* at 1124. Mr. Opsal quoted § 6 of the Assistance Agreement executed by FHLBB and Statesman, which provided that the forbearance permitting Statesman to credit the forbearance toward regulatory capital was " 'not intended to address in any way the accounting treatment' of FSLIC assistance." *Id.* (quoting *id.* at 1630). The same language appears in § 6 of plaintiff's Assistance Agreement. Def.App. v.1 at 512–13. Mr. Opsal stated in a letter to Statesman on April 11, 1989, that "[i]f there was to be any further departure from GAAP, such as relief from the necessity of amortizing the goodwill resulting from the FSLIC contribution, it would have to have been specifically stated in the forbearance. Since it was not, the amount of capital must be calculated by the usual standards." *Id.* v.2 at 1130. A third letter from Mr. Opsal to Statesman, written on June 9, 1989, stated that "RAP requires amortization of the $21,000,000 in goodwill created from the FSLIC capital contribution." *Id.* at 1151. Transohio and Statesman, like plaintiff, received FSLIC cash assistance and were granted the SM–1 forbearance,[14] and nothing in their Assistance Agreements distinguished the treatment of their RAP goodwill from plaintiff's.[15]

Other contemporaneous statements likewise suggested that FHLBB policy on goodwill created by FSLIC assistance was that such goodwill must amortize. An internal letter from Jerry Benham, Supervisory Agent, to FHLBB Chief Accountant Thomas Bloom, after explaining that Transohio had RAP goodwill in the amount of $152,931,000, expressed the view that, since "nothing in the forbearance authorizes a departure from this GAAP requirement ... Transohio should be amortizing all of the goodwill of $152,931,000 to expense." *Id.* at 1119. An internal FHLBB memo stated that goodwill created by an acquisition must be amortized. *Id.* at 1314. Mr. Bloom endorsed that approach in a subsequent letter to Transohio, stating that Transohio should "write off all goodwill [resulting from FSLIC assistance] to expense." *Id.* at 1123. FHLBB's Case Processing Manual, apparently a statement of FHLBB policy, stated that when FSLIC assistance is included in regulatory capital, "the goodwill created will remain on the books of the institution and should be amortized over a period no greater than the estimated remaining life of the long-term interest-bearing assets ac-

---

**14.** The SM–1 forbearance was not mentioned by that name in the forbearance letters or the FHLBB approval resolutions of plaintiff, Transohio, or Statesman. For all three institutions, however, FHLBB stated that its contribution could be deemed a "credit," a "contribution," or a "direct addition," or some combination of these terms, to regulatory capital. *Compare* Pl. App. v.3 at 2196 (plaintiff's approval resolution, stating that "the initial cash contribution ... may be deemed a contribution to regulatory capital, and may be booked as a direct credit to [plaintiff's] capital account") *with* Def.App. v.1 at 568 (plaintiff's forbearance letter, stating that the contribution "is to be a credit to [plaintiff's] regulatory capital" and that plaintiff "may book such initial contribution as a direct addition to its regulatory capital"); *with id.* v.2 at 1576 (Transohio's approval resolution, stating that "the cash contribution ... may be deemed a contribution to net worth and may be booked [as] a direct credit to Transohio's net worth"); *with id.* at 1686–87 (Statesman's approval resolution, stating that the contribution "shall be credited to the regulatory capital account" of the acquiror); *with id.* at 1689 (Statesman's forbearance letter, stating that the contribution is "to be a credit to [Statesman's] regulatory capital" and that Statesman "may book such contribution as a

direct addition to its regulatory capital"). The language of the SM–1 as set out in Memorandum SP–37a provided that the contribution "is to be a credit to" the institution's "regulatory net worth" and that the institution "may book such contribution as a direct addition to its net worth." *Id.* v.1 at 399. It appears, therefore, that all three institutions were granted the SM–1 forbearance.

**15.** Plaintiff cites deposition testimony of Julius Earle, a former FHLBB employee who apparently was involved in the negotiations over the Transohio merger, as evidence that FHLBB did not intend Transohio's RAP goodwill to amortize. Pl. Reply at 48–49. Mr. Earle testified that he believed that Transohio's RAP goodwill was a nonamortizing addition to capital. Pl.App. v.6 at 3221–22. As Mr. Earle acknowledged, however, the issue was never raised in the Transohio negotiations, nor was it addressed in the Assistance Agreement or any other document. *Id.* at 3222. The Transohio Assistance Agreement, like plaintiff's, incorporated GAAP except when the Agreement specifically stated otherwise. Def.App. v.2 at 1559. Transohio's example therefore supports defendant's position that, when FHLBB's attention was drawn to the question, it interpreted GAAP as requiring amortization.

quired." [16] *Id.* at 1033.

Plaintiff has offered no contemporaneous evidence to support the view that FHLBB regulators negotiating the Assistance Agreement with plaintiff understood that the Assistance Agreement deviated from FHLBB policy regarding the duration of RAP goodwill. Indeed, Alvin Smuzynski, the regulator who approved plaintiff's forbearance and who advised the Bank Board chairman on the merger, testified that he believed that RAP goodwill created by the Assistance Agreement would be subject to amortization. Def.App. v.6 at 5000–01, 5010. A June 1989 article by Robert Pomeranz,[17] a former employee of FHLBB and liaison between FHLBB and FASB, also stated that RAP goodwill amortizes. Def.App. v.2 at 1164–69; Def. Reply at 31–32.[18]

### b. Thrift Financial Reports

The Thrift Financial Reports (TFRs) and accompanying instructions then used for thrift reporting also support the view that defendant interpreted GAAP as requiring the amortization of FSLIC contributions. The TFR forms on which plaintiff reported its goodwill in 1987 and 1988 listed RAP goodwill and other kinds of goodwill together on a single line, line A544, "goodwill and other." *See, e.g.*, Def.App. v.2 at 1173 (June 30, 1987 TFR). The instructions required the thrift to report "the total amount of unamortized goodwill and intangibles" on that line. Pl. Reply at 23; Def.App. v.2 at 1378. As defendant explains, the initial contribution was recorded on line C030, "Contributed Capital," and never decreases, while the amortization of the goodwill on line A544 was reported as an expense on line E110, "Amortization of Goodwill" and thereby caused line C115, "Retained Earnings," to decrease. Def. Reply at 15–16; *see also* Def.App. v.2 at 1172. The decrease on line C115, when amortization is complete, offsets the credit on line C030. Def. Reply at 15. Plaintiff has not disputed this explanation of the pre–1989 TFRs' approach to the amortization of goodwill.

The 1989 TFRs adopted a different format, under which the $299 million was removed from both line A544 and line C030, and reported only once, on line C978, outside the assets-liabilities balance. Def. Reply at 37. The instructions make clear that the amount on the new line C978 decreased as goodwill amortized: "GAAP requires that goodwill be reduced by the amount of FSLIC assistance in a merger accounted for under the purchase method of accounting. The amount reported on this line represents the unamortized amount of the assistance that previously would have been reported on line A544." [19]

---

**16.** Plaintiff has raised concerns regarding the trustworthiness and probative value of the Case Processing Manual on the grounds that it appears to be a draft rather than a finalized version. Plaintiff's Motion to Strike at 4; Pl. Reply at 42. Defendant has submitted the affidavit of a former FSLIC employee, who testified that the version of the Case Processing Manual submitted with defendant's Motion for Summary Judgment was, in fact, the final version. Def.App. v.8 at 6015–16. The statements of policy on this subject in the Case Processing Manual are confirmed and supported by numerous contemporaneous sources. Any concerns that the manual does not genuinely represent the views of FHLBB regarding the amortization of RAP goodwill appear groundless.

**17.** Plaintiff's objection to the admission of Mr. Pomeranz's statement is addressed in the court's discussion and disposition of plaintiff's Motions to Strike, attached to this opinion as Appendix A and incorporated by reference. *See* n. 2 *supra.*

**18.** Plaintiff cites the example of Commercial Federal, which apparently was given a $20 million promissory note that matured after five years and that, due to an explicit understanding between the thrift and FHLBB, did not amortize. Pl. Surreply at 21–22; Pl.App. v.6 at 3218 (FHLBB letter to Commercial Federal stating that "it was decided that it was not the intent of the Federal Savings and Loan Insurance Corporation to establish an asset that would have to be amortized"). There was no such understanding between FHLBB and plaintiff regarding the nonamortization of plaintiff's RAP goodwill, however, and accordingly Commercial Federal is not relevant to this case.

**19.** The words "that previously would have been reported" appear as a handwritten notation in the TFR instructions. Def.App. v.2 at 1472. They appear to replace the word "remaining," meaning that the original sentence read, "The amount reported on this line represents the unamortized amount of the assistance remaining on Line A544." There is nothing in the record indicating who made the handwritten notation, or under what circumstances it was made. The court finds, however, that the notation does not change the meaning of the instruction. The admissibility of the notation is therefore not relevant to the determination of this issue.

Def.App. v.2 at 1472. Rather than reporting the FSLIC contribution as an unchanging amount but offsetting it with another line, the 1989 TFR directs that the thrift report the amortization by reducing the amount of FSLIC assistance recorded, since the "FSLIC Capital Contribution" line now represents "the unamortized amount of the assistance." *Id.* The reference to "the unamortized amount of the assistance" indicates that FHLBB intended that the amount reported on line C978 amortize. The analysis is complicated somewhat because plaintiff did not, in fact, calculate and enter the amortization, as discussed in subsection (c) just below, but the instructions are clear that amortization was, in fact, required.

### c. Reporting History

 Plaintiff cites the nonamortization of the credit in the time between the execution of the Assistance Agreement and the passage of FIRREA, along with deposition testimony by plaintiff's employees, as evidence that plaintiff understood its RAP goodwill to be nonamortizing, and that the absence of explicit discussions on this issue suggests that plaintiff's belief was in good faith. Pl. Response at 24–25, 27–29. The nonamortization in plaintiff's reporting (and the government's failure to challenge it) does not persuade the court, however, that FHLBB shared plaintiff's view of the permanence of RAP goodwill. The good faith in which plaintiff held its view is not at issue here.

The TFR forms on which plaintiff reported its goodwill in 1987 and 1988 listed RAP goodwill and other kinds of goodwill together on a single line, line A544, "goodwill and other." *See, e.g.,* Def.App. v.2 at 1173 (June 30, 1987 TFR). Plaintiff reported the increase in goodwill on this line at the time of the acquisition, and the amount reported there fluctuated rather than simply decreasing (due to other transactions, the court assumes) over the next several reporting periods. *Compare* Def.App. v.2 at 1173 (June 30, 1987 TFR reporting $566,422,000 on line A544) *with id.* at 1189 (December 31, 1987 TFR reporting $573,344,000 on line A544); *with id.* at 1196 (March 31, 1988 TFR reporting $576,865,000 on line A544); *with id.* at 1199 (June 30, 1988 TFR reporting $573,207,000 on line A544); *with id.* at 1209 (September 30, 1988 TFR reporting $552,121,000 on line A544); *with id.* at 1222 (December 31, 1988 TFR reporting $542,323,000 on line A544). Since the various assets whose aggregate value appears on line A544 are not reported individually, an examiner reviewing these TFRs would have to be familiar with unreported aspects of plaintiff's finances to know that plaintiff was not amortizing RAP goodwill.

FHLBB conducted an examination of plaintiff in the fall of 1988 that, among other things, broke the goodwill reported at line A544 into its component parts. Pl.App. v.6 at 3131. That examination did not note that plaintiff was not amortizing RAP goodwill. As defendant's expert has stated, however, verifying compliance with regulatory capital reporting standards was not the primary mission of the examination; rather, the examination focused on consumer protection issues. *Id.* at 2906–08. Regulators' failure to call attention to the nonamortization of RAP goodwill (which arose from a transaction with which the regulators were not necessarily familiar) does not in itself signify that the nonamortization was acceptable to FHLBB, especially since the examination was not, according to defendant's expert, a "full scope" examination. *Id.* at 2907. Moreover, defendant's expert testified that, in his knowledge of such examinations, the review of the TFRs would likely be limited to ensuring that the numbers add up properly, and would not extend to verifying that the accounting was done in compliance with the Central acquisition. *Id.* at 2910–11. Such a review would not necessarily catch plaintiff's failure to amortize RAP goodwill. Indeed, the accounting books would balance with or without the amortization. The examiners stated that "[n]o verifications to the original transaction documents or to the ledger account contents were made for any line item," suggesting that the examiners verified only that the reporting was internally consistent. *Id.* at 3106.

While the results of the 1988 examination certainly support the *bona fides* of plaintiff's belief that its treatment of RAP goodwill was proper, the legally relevant view of that

treatment, under § 20 of the Assistance Agreement, is GAAP and, in the absence of any agreement by defendant to forbear from enforcing what GAAP requires, GAAP "as subsequently clarified or interpreted" by FHLBB. Def.App. v.1 at 556.

Plaintiff's argument that the regulators conducting the 1988 examination must have reviewed and approved the nonamortization of RAP goodwill is unpersuasive. Pl. Surreply at 8–9. Plaintiff contends that the examiners devoted 70 hours of time to the verification of plaintiff's capital compliance. *Id.* at 8. As an initial matter, the court notes that the 70 hours refers to time spent on "Financial Analysis," which may or may not encompass review of plaintiff's TFRs, and may include many other aspects of the examination as well. *See* Pl.App. v.6 at 3367. Plaintiff has offered no evidence other than its own assertion that "Financial Analysis" refers specifically to TFR review. The manual that governed the administration of the examination did, as plaintiff claims, direct the examiners to "[d]etermine whether the institution is in compliance with ... agreements with FSLIC." *Id.* v.7 at 3552; Pl. Surreply at 9. But the examiners' statement that "no verifications to the original transaction documents ... were made for any line item" indicates that, for whatever reason, they did not follow the manual's directions in that regard. Pl. App. v.6 at 3106. Even if the examiners did spend 70 hours in close review of the lines that bear on amortization, it appears that they were not in a position to evaluate compliance, since they were not informed of the terms of the Assistance Agreement. There was nothing inherently remarkable about the reporting figures themselves that would have directed defendant's attention to the issue of amortization in the absence of reference to the contract documents. A large amount of goodwill that reduces only slightly may reflect a long amortization period for all of it or, alternatively, a shorter amortization peri-

od for some of it and no amortization for the rest.[20]

Plaintiff's reports for the first two quarters of 1989 reflect more clearly the nonamortization of RAP goodwill, since the TFR format had changed. *See* Def.App. v.2 at 1238 (March 31, 1989 TFR, listing line item C978, "FSLIC Capital Contributions," and reporting $299,883,000 on that line); *id.* at 1249 (June 30, 1989 TFR, with same listing). The instructions appended to the 1989 TFRs suggest, however, that plaintiff was to report on line C978 "the unamortized amount of the assistance that previously would have been reported on line A544," meaning that plaintiff should have understood that the amount of the FSLIC contribution that could be reported on line C978 was amortizing. *Id.* at 1472. The failure by defendant to require the correction of plaintiff's error in two quarterly reports does not show that FHLBB believed that RAP goodwill could be nonamortizing, particularly in light of the evidence that FHLBB's policy was to amortize RAP goodwill. Moreover, the Assistance Agreement included a nonwaiver clause that foreclosed the possibility that FHLBB could, by mere failure to object to the nonamortization, be held to have conceded that plaintiff's treatment of RAP goodwill was proper.

Section 24 of the Assistance Agreement provides that "[a]ny forbearance, failure, or delay by any party in exercising or partially exercising any ... right, power, or remedy [conferred by the contract or by applicable law] shall not preclude its further exercise." Def.App. v.1 at 559. Nonwaiver clauses have been found by federal courts to be enforceable in certain contexts. *See United States v. Epstein,* 27 F.Supp.2d 404, 408–09 (S.D.N.Y.1998) (enforcing nonwaiver clause in lease agreement in which federal government was landlord). Because plaintiff has sued under the Tucker Act, 28 U.S.C. § 1491, the interpretation of the contract is ordinari-

---

**20.** Plaintiff also claims that OTS approved the nonamortization of plaintiff's RAP goodwill in a 1994 examination. Pl. Surreply at 11. The evidence plaintiff supplies in support of this argument, however, consists of one page of what appears to be an examination manual, with the words "In Coast's instance there was no amortization as it was a 'permanent capital' infusion

regulatory purposes [sic]" handwritten on it. Pl. App. v.7 at 3548. There is no indication of who made the handwritten notation, under what circumstances it was made, and what connection it had with any particular examination of plaintiff. The court finds that the evidence is insufficient to support the claim of OTS approval of nonamortization.

ly governed by federal law. *See Keydata Corp. v. United States,* 205 Ct.Cl. 467, 504 F.2d 1115, 1123 (1974) ("[I]t is settled that the contracts of the Federal Government are normally governed, not by the particular law of the states where they are made or performed, but by a uniform federal law."); *Quiman, S.A. v. United States,* 39 Fed.Cl. 171, 177 (1997) (invoking federal law of contracts in suit brought under Tucker Act), *aff'd,* 178 F.3d 1313 (Fed.Cir.1999); *Sun Cal. Inc. v. United States,* 25 Cl.Ct. 426, 428 (1992) ("Federal government contracts generally are governed by federal law rather than by the law of the particular states in which the contracts are executed or performed."). The parties have cited no federal contract law, and the court has found none, regarding the enforceability of the nonwaiver clauses in an agreement in a *Winstar*-related case.

Section 25 of the Assistance Agreement directs, however, that "[t]o the extent that Federal law does not control, this Agreement and the parties' rights and obligations under it shall be governed by the law of the State of California." Def.App. v.1 at 560. California courts have upheld and applied nonwaiver clauses. *See, e.g., Southern Calif. Edison Co. v. Superior Court,* 37 Cal.App.4th 839, 44 Cal.Rptr.2d 227, 233–34 (1995) (discussing application of nonwaiver clause); *Posey v. Leavitt,* 229 Cal.App.3d 1236, 280 Cal.Rptr. 568, 575 n. 11 (1991) (rejecting "course of dealing" argument in light of nonwaiver clause). Absent controlling federal contract law deeming the nonwaiver clause unenforceable, the court follows the express terms of the parties' contract and, consistent with California law, applies the clause.

Under the nonwaiver clause, a failure on multiple occasions to correct plaintiff's nonamortization did not deprive FHLBB of the right to insist on such amortization at a later time. *See Walt v. Superior Court,* 8 Cal. App.4th 1667, 11 Cal.Rptr.2d 278, 282–83 (1992) (applying nonwaiver clause and finding lease agreement enforceable despite acceptance of monthly rent for period of 18 months). Plaintiff's argument that "the par-

ties' course of dealing confirms Coast's construction of the contract," Pl. Surreply at 2, is unpersuasive.[21]

### d. Other Evidence

Plaintiff points to the instruction appended to the pre–1989 TFRs, which called the capital contributions to be recorded on line C030 "permanent capital contributions," and argues that the designation "permanent" signifies that the assistance did not amortize. Transcript of September 19, 2000 Conference (Conf. Tr.) at 30–31. Plaintiff relies on deposition testimony by Edwin Gray, former FHLBB chairman, to the effect that the contribution was "permanent," in support of the same argument. Pl. Reply at 36–37. As defendant has observed, however, in an argument uncontradicted by plaintiff, FSLIC could have made capital contributions to plaintiff in the form of loans rather than cash, and plaintiff eventually would have had to repay FSLIC when the loan instruments matured. Def. Reply at 38 n. 14. The TFR instructions explicitly draw a distinction between assistance made without a capital instrument, which was to be reported on line C030, with assistance made in the form of a capital instrument, which was to be reported on various other lines. Def.App. v.2 at 1398. The amendment to the TFR instructions issued in April 1988 is even clearer. It refers to "[p]ermanent FSLIC cash infusions (i.e., no capital instrument has been (or will be) issued)." Def.App. v.7 at 5063. "Net Worth Certificates," "Accrued Net Worth Certificates," and "Income Capital Certificates" were to be reported on lines C070, C080, and C090, respectively. *Id.* v.2 at 1398–99.

The deposition testimony of Mr. Gray that plaintiff cites indicates considerable confusion about whether the deposing attorney's references to a "capital credit" referred to the cash itself or to the accounting treatment of it. For example, in response to a question about why he believed that "the capital credit would last in perpetuity," Mr. Gray testified as follows:

Well, because—because there is no—there no [sic] basis to think otherwise. I mean

---

21. FHLBB's acquiescence in plaintiff's nonamortization of the capital contribution may mean, however, that FHLBB did not in fact interpret

GAAP as requiring amortization. The significance of plaintiff's reporting history is discussed below.

there's—if you say, for example, [that a] cash contribution made under this provision shall be credited to the acquiring association's net worth account and shall constitute regulatory capital, particularly because it's cash, it's a credit, it's cash, how do you—how do you put a time frame on cash?

Def.App. v.1 at 846. Mr. Gray subsequently qualified the statement about "perpetuity," saying that the credit would be perpetual "[u]nless there is something else in this agreement that would modify the crediting of cash to the acquiring institution." *Id.* Mr. Gray's discussions of the nature of cash indicate that he was using the term "capital credit" to refer to the cash itself, rather than to the accounting treatment of the SM–1 forbearance. Cash is not inherently nonamortizing, but a grant of cash—as opposed to a loan or a capital instrument—is "perpetual" simply because it does not have to be repaid. Mr. Gray did not mention amortization in his discussion of perpetuity, but he did refer to "something that would modify the crediting of cash," *id.* at 846, which would not affect the accounting treatment (since the initial "crediting" is not related to amortization) but might affect whether the credit had to be repaid. The court thinks it likely that Mr. Gray was referring to "perpetuity" as meaning that the acquiring institution did not need to repay the credit, not describing the credit as nonamortizing. Neither the TFR instructions' references to "permanence" nor Mr. Gray's ambiguous references to "perpetuity" require the court to ignore the text of the contract.

The court notes that the *en banc* Federal Circuit and the Supreme Court's plurality opinion in *Winstar* mentioned the "permanence" of FSLIC contributions. Specifically, the Federal Circuit, in addressing the case of Statesman Bank (one of the three institutions then at issue in the consolidated *Winstar* proceedings), stated:

> Under the Assistance Agreement and the Bank Board resolution approving the merger, $26 million of this cash contribution (including $5 million represented by a debenture that Statesman was required to pay back) was to be permanently credited to Statesman's regulatory capital (i.e., as a capital credit) for purposes of meeting minimum regulatory capital requirements.

64 F.3d at 1537.

The Supreme Court plurality observed that FSLIC "contributed cash ... and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital." 518 U.S. at 853, 116 S.Ct. 2432. The court does not understand those comments to be inconsistent with the court's view of the Assistance Agreement here. The treatment of capital contributions at the time of the execution of Statesman's Assistance Agreement permanently credited the entire amount of the contribution to regulatory capital on one line, line C030, while gradually amortizing it on another line, so "permanence" in this context was entirely compatible with amortization.[22] Statesman and the government did not litigate the issue in dispute between the parties in this case. Indeed, neither the Federal Circuit nor the

---

**22.** The instructions for line C030 state that certain capital instruments should be reported on other lines, but debentures are not among the instruments to be included on those lines. Def. App. v.2 at 1397–98 (TFR instructions issued in January 1987). It therefore appears, though the instructions do not say so explicitly, that debentures may be included on line C030. Statesman did argue at one point in the course of its correspondence with FHLBB that it was entitled to credit $26 million in cash toward regulatory capital, rather than $21 million, owing to an ambiguity in the Assistance Agreement (which provided that $26 million of the FSLIC contribution could be credited toward regulatory capital). Def.App. v.2 at 1135–37, 1630. It never contended, however, that it was entitled to *permanently* credit the debenture toward regulatory capital.

Its argument that the Assistance Agreement must have been referring to cash rather than the debenture in designating the additional $5 million implies that the treatment under regulatory capital of a debenture that had to be repaid would be less favorable for Statesman. Moreover, Statesman's letter indicates confusion over whether the amount that should be credited to regulatory capital is $21,000,000 or $26,000,000. *See* id. at 1136 (" § 2 of the [Regulatory Capital Maintenance Agreement] does fix the dollar figure of regulatory capital, being either $21,000,000 or $26,000,000."); *id.* ("Section 8 simply provides that the obligation under § 2 to include the Regulatory Capital permitted in the Assistance Agreement and in the forbearances ($26,000,000 or $21,000,000) is perpetual.").

Supreme Court made more than single references to the issue of "permanence." The main issue in those appeals was liability for breach of contract, not the viability of one or another system of accounting. That FSLIC capital contributions were "permanent" cash contributions rather than loans does not require that they be nonamortizing. The distinction between the permanence of a capital contribution and the permanence of its accounting treatment remains.

The court also finds plaintiff's reliance on the example of Citizens Federal Bank misplaced. Plaintiff quotes language from the Bank Board resolution accompanying Citizens's assistance agreement: "[F]or regulatory accounting purposes, Citizens may credit $86 million of the FSLIC's initial cash contribution pursuant to the Assistance Agreement to its regulatory capital account at the Effective Date, *provided* that Citizens shall amortize such amount over a period of twenty-five years." Pl.App. v.6 at 3025 (emphasis in original). Plaintiff contends that the silence of its Assistance Agreement on the amortization question, contrasted with the explicit statement in Citizens's Agreement, indicates that FSLIC's contribution to it was not intended to amortize. Pl. Reply at 47. The court does not believe that this is the correct inference. It is much more likely that the clause setting a time period for Citizens's amortization implemented the SM-2 forbearance giving Citizens an extended goodwill amortization period. *Compare* Def. App. v.1 at 399 (SM-2 forbearance, stating that "[f]or purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by (resulting institution) over a period not to exceed ( ) years by the straight line method") *with* Pl.App. v.6 at 3027 (Citizens's forbearance letter, stating that "[f]or purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by Citizens over a period not to exceed 25 years by the straight line method"). Plaintiff requested, but was not granted, the SM-2 forbearance. *Compare* Def.App. v.1 at 352 (letter request-

ing permission to amortize intangibles over 40 years) *with* Pl.App. v.3 at 2196–97 (FHLBB resolution approving plaintiff's acquisition with no reference to amortization period).

Plaintiff also argues that FHLBB's statement of the amortization language in both its resolutions approving Citizens's merger (in the context of a reference to the capital credit) and its forbearance letter (referring directly to SM-2) indicates that SM-2 applies to GAAP goodwill alone since, theoretically, FHLBB could have stated the SM-2 only once if it refers to both GAAP and RAP goodwill. Pl. Reply at 19–20; *compare* Pl. App. v.6 at 3025 *with id.* at 3027. Plaintiff has not shown, however, that FHLBB regarded its approving resolutions and its forbearance letter as mutually exclusive or took any pains to eliminate redundancy; indeed, plaintiff's own approval resolutions and forbearance letter are redundant, since both documents include provisions for the crediting of the FSLIC contribution toward regulatory capital. *Compare* Pl.App. v.3 at 2196 ("[T]he initial cash contribution by the FSLIC pursuant to the Assistance Agreement may be credited to the capital account of [plaintiff]") *with* Def.App. v.1 at 568 ("[T]he initial cash contribution to be made to Coast Savings pursuant to an assistance agreement ... is to be a credit to Coast Savings' regulatory capital"). Likewise, in the case of Statesman, the approval resolutions and the forbearance letter contain virtually identical language regarding Statesman's capital credit. *Compare* Def.App. v.2 at 1686–87 *with id.* at 1689.

Plaintiff's argument that RAP goodwill did not arise from application of the purchase method, and that SM-2 (which refers specifically to the purchase method) therefore did not apply to RAP goodwill, is likewise unpersuasive. Pl. Reply at 19–20; Def.App. v.1 at 399. As defendant's expert has pointed out, uncontradicted by plaintiff, purchase method accounting marked Central's assets and liabilities to market, rather than incorporating them into plaintiff's balance sheet without conducting an independent valuation. Pl. App. v.6 at 2928. Only the purchase method creates goodwill, and it creates RAP goodwill

(when the SM–1 forbearance is applied to an acquisition involving FSLIC assistance) as well as GAAP goodwill. *Id.* Applying the SM–1 forbearance in a merger reported under purchase method accounting does not make the purchase method inapplicable; it merely permits the acquiring association to record more capital than would otherwise be recognized under GAAP.

### 4. Reasonableness of FHLBB's Interpretation

The court finds that FHLBB's interpretation of GAAP was that capital contributions from FSLIC were required to amortize. The court now considers whether FHLBB's interpretation of the contract was reasonable.

### a. Standard of Review

■ It is well established that the government may, in negotiating contracts, insist that its own interpretation of particular contract terms govern. *See United States v. Wunderlich,* 342 U.S. 98, 99–100, 72 S.Ct. 154, 96 L.Ed. 113 (1951); *United States v. Moorman,* 338 U.S. 457, 460, 70 S.Ct. 288, 94 L.Ed. 256 (1950); *Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1564 (Fed.Cir. 1990). In *Moorman,* the Supreme Court upheld a contract provision providing that the Secretary of War's ruling on contract disputes "shall be final and binding." 338 U.S. at 458 n. 1, 460, 70 S.Ct. 288. The *Wunderlich* Court upheld *Moorman* in upholding a clause vesting authority in a contracting officer to decide questions of fact, subject to appeal to the head of the department, and the Federal Circuit in *Seaboard* followed *Wunderlich* and *Moorman* in holding that a contractor may waive its right to a judicial determination of its contract rights. 342 U.S. at 99, 72 S.Ct. 154, 903 F.2d at 1563. The *Seaboard* court observed that the contractor "voluntarily and knowingly waived any right to dispute resolution except in accordance with the contract." 903 F.2d at 1565. The *Seaboard* court also held that the contracting officer's decision may not be overturned absent a showing of fraud or bad faith. *Id.* at 1564.

The Assistance Agreement in this case made no provision for formal dispute resolution, either within or outside FHLBB, but it did not need to; in *Moorman* the Supreme Court upheld a dispute resolution mechanism that consisted of a single written appeal to an agency head. 338 U.S. at 463, 70 S.Ct. 288. Two other thrifts, Transohio and Statesman, disputing the same question and faced with virtually identical contract provisions vesting interpretive authority in FHLBB, argued the question with FHLBB representatives through correspondence, and the FHLBB explained its position at some length. *See* Def. App v.2 at 1559, 1676 ("Accounting Principles" clauses of Assistance Agreements for Transohio and Statesman); *id.* at 1109–16, 1125–63 (correspondence between Transohio and FHLBB, and Statesman and FHLBB). To the extent that the *Moorman* line of cases can be read as requiring even a minimal amount of procedure, the correspondence history from the Transohio and Statesman cases indicates that the procedure was available.

It is unclear what, if any, standard of review this court should apply to FHLBB's interpretation of GAAP, which governs this contract under § 20 of the Assistance Agreement. *See* Def.App. v.1 at 556 ("[T]he accounting principles … shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board"). In *Seaboard,* the Federal Circuit held that a court could disturb an agency's decision on contract disputes only on a showing of fraud, but that criterion is more applicable to review of proceedings before an administrative tribunal, where the contracting officer makes representations to a third party. 903 F.2d at 1564. It is difficult to imagine how the court could find fraud (since *Seaboard* appears to be referring to fraud on a court or tribunal) when the issue was never raised by plaintiff in a way that triggered any sort of proceedings prior to this one.

The court need not decide the point, however, because the two statements of policy governing FHLBB's interpretation strongly suggest that its interpretation of GAAP as requiring the amortization of FSLIC assistance was reasonable. Memorandum SP–37a, which detailed the SM–1 forbearance, permitted plaintiff to disregard FASB 72's instruction to reduce the amount of the in-

tangible asset reported by the amount of cash assistance, but nothing in the forbearance suggests that the rest of FASB 72 should also be ignored. Def.App. v.1 at 399. FASB 72 makes no distinction between GAAP goodwill and RAP goodwill in setting out the required amortization period. FASB 72 merely states in paragraph 5 that the excess of liabilities assumed over assets acquired "constitutes an unidentifiable intangible asset," and goes on to require that the asset be amortized. Def.App. v.2 at 1100.

b. Memorandum SP–37a and FASB 72

Plaintiff argues that the SM–1 forbearance as set out in Memorandum SP–37a exempts the goodwill in question from amortization since, unlike the SM–2 forbearance (which, plaintiff claims, does not apply to RAP goodwill), it does not set a specific amortization period. Pl. Reply at 18. That argument overlooks the respective purposes of the two forbearances and does not, the court believes, accurately describe their respective effects on accounting. SM–1 exempts goodwill from the offsetting reduction required by FASB 72, whereas SM–2 changes the amortization period for the goodwill from the FASB 72 requirement (specifically, the estimated remaining life of the long-term interest-bearing assets). Def.App. v.1 at 399; *id.* v.2 at 1100–01. SM–2 makes no distinction between GAAP and RAP goodwill. The thrifts that were granted the SM–2 forbearance, including Transohio and Statesman, were instructed to apply it equally to the two kinds of goodwill. Def.App. v.2 at 1115–16, 1130–31 (FHLBB correspondence with Transohio and Statesman directing each of them to amortize RAP goodwill over a 25–year period); *id.* at 1577, 1687 (FHLBB Resolutions approving Transohio and Statesman mergers, certifying that thrifts may depart from GAAP in amortizing intangible assets over 25 years).

Plaintiff's argument that RAP goodwill is outside the purview of FASB 72 altogether is unpersuasive. Pl. Reply at 15. In its discussion of the treatment of FSLIC-assisted mergers, FASB 72 makes a distinction between mergers where "receipt of the assistance is probable and the amount is reasonably estimable" and those where the existence and amount of the assistance are not clear at the time of the merger. Def.App. v.2 at 1100–01. In the case where the terms of assistance are unclear, FASB 72 directs that "any assistance subsequently recognized in the financial statements shall be reported as a reduction of [goodwill]"; when the terms are clear, FASB 72 directs that "that portion of the cost of the acquired enterprise shall be assigned to such assistance." *Id.* at 1101. The difference underlying the distinction appears to be in the subsequent accounting treatment. If the assistance is reported as a "reduction" of goodwill, then the amount reported on line A544 would be reduced by the amount of the assistance. If the "cost of the acquired enterprise" is "assigned" to the contribution, however, then the reported liabilities are reduced. Plaintiff's forbearance permitted it to take a third accounting route. Plaintiff preserved both the liabilities and the goodwill asset, and reported an additional $299 million as "contributed capital." An alternative accounting treatment of RAP goodwill does not indicate that the acquisition is outside FASB 72 altogether, however. Nothing in the section of FASB 72 governing the reporting of FSLIC assistance states that exemption from the requirements of that section waives all the requirements of FASB 72 for that thrift. Nor does the Assistance Agreement say or imply that GAAP is entirely inapplicable to plaintiff. Section 6 of the Agreement, as the court has discussed, in fact states that the "shall be credited" and "shall constitute" language "is not intended to address in any way the accounting treatment" of the capital contribution. *Id.* v.1 at 512.

Plaintiff emphasizes the difference between the two accounting treatments provided for in FASB 72, noting particularly that FASB 72 does not use the word "reduction" in addressing the treatment of FSLIC assistance when the amount of the assistance is clear. Pl. Reply at 12. But the omission of the word "reduction" from the relevant sentence in FASB 72 ("[i]f receipt of the assistance is probable and the amount is reasonably estimable, that portion of the cost of the acquired enterprise shall be assigned to such assistance") does not compel the conclusion

that the goodwill resulting from the forbearance is wholly unknown to FASB 72, or to its amortization requirements, as plaintiff suggests. Def.App. v.2 at 1100–01. Confirming this view are statements in the correspondence between FHLBB and Transohio in which FHLBB referred to FASB 72 as requiring the amortization of RAP goodwill. *Id.* at 1115, 1119. The court finds this interpretation reasonable.

### 5. Amortization Period

■ Finally, plaintiff's argument that RAP goodwill should be subject to a 25–year amortization period rather than a 12.7–year period also fails. Pl. Reply at 52–53. The excess of liabilities over assets in this case was $347 million, and FASB 72 clearly requires that such excess is subject to amortization over a period no greater than the life of the long-term interest-bearing assets—in this case, 12.7 years.[23] Def.App. v.2 at 1100. Plaintiff argues that the FSLIC assistance should be treated as an asset, thereby reducing the excess of liabilities over assets to $48 million. Pl. Reply at 54. But the accounting treatment of such assistance under FASB 72 contradicts that view. Whether the assistance reduced the amount of goodwill recorded or reduced the amount of liabilities recorded, in neither case is it credited to the institution as an asset. Pl. Reply at 12–13; Def.App. v.2 at 1101. If it were appropriate to treat the FSLIC assistance in this case as a reduction of liabilities, then the gap between assets and liabilities would be properly treated as $48 million, but such assistance is only treated as a reduction of liabilities when its existence or amount is uncertain, as plaintiff has itself explained. Pl. Reply at 12–13. FASB 72 governs all aspects of plaintiff's acquisition of Central other than the forbearance, and requires that plaintiff amortize its goodwill over a period of 12.7 years.

### 6. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is GRANTED with respect to the duration of the capital credit, and plaintiff's Cross–Motion for Summary Judgment on the same issue is DENIED.

## C. Foreseeability

■ In a contract case, a plaintiff is entitled only to those damages that the breaching party could reasonably have contemplated at the time of contract formation. *Prudential Ins. Co. v. United States,* 801 F.2d 1295, 1300 (Fed.Cir.1986). The breaching party must be able to foresee the type of damages, but the precise amount need not be foreseeable. *Gardner Displays Co. v. United States,* 171 Ct.Cl. 497, 346 F.2d 585, 589 (1965). A plaintiff may show either that the defendant actually did foresee the type of damages pleaded or that it should, in the ordinary course of events, have foreseen such damages. *See Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701, 714 (1953); Restatement (Second) of the Law of Contracts § 351(2) (1981). Plaintiff contends that the types of damages it seeks in this case—lost profits, capital replacement costs, and "wounded bank" damages—were foreseeable to the government at the time of contracting, while defendant argues that it could not have foreseen those damages. Pl. Response at 32–34; Def. Mot. at 73–74. Both parties have moved for summary judgment on the element of foreseeability of damages as a result of defendant's breach.

### 1. Actually Foreseen

■ Plaintiff argues that the government actually did foresee plaintiff's damages, and cites the testimony of various FHLBB officials in support of that argument. Pl. Response at 34–38. The questions posed to those officials, however, related to the abstract question of whether depriving plaintiff of a capital credit would produce those damages, rather than to the officials' expectations at the time this particular contract was executed. *See, e.g.,* Def.App. v.1 at 850–51 (deponent acknowledging that damages were foreseeable but denying that he actually fore-

---

**23.** Defendant has stated that the proper amortization period under FASB 72 is 12.7 years. Def. Mot. at 17 n. 5. Defendant points to plaintiff's statement in its 1987 Annual Report that the loans acquired from Central had an estimated remaining life of 12 years. Def. Mot. at 17 n. 5; Def.App. v.1 at 465. Plaintiff has not disputed this calculation.

saw them); Pl.App. v.2 at 1028 (asking generally about cases where capital was treated as capital credit); Pl.App. v.1 at 739 (asking generally about whether an institution granted a capital credit could use it as leverage); Pl.App. v.2 at 792–93 (asking about deponent's specific expectations, but deponent answering only that he would not have permitted plaintiff to leverage its capital to an extent that would endanger the bank, and that he expected plaintiff to leverage its capital to the extent indicated by its business plan). The testimony of these officials is probative of what the regulators responsible for negotiating this particular contract should have foreseen, but it does not demonstrate that they actually did foresee plaintiff's pleaded damages. For purposes of demonstrating that its damages were reasonably foreseeable, plaintiff has not shown that they actually were foreseen.

### 2. Should Have Been Foreseen

 Plaintiff argues persuasively, however, that the government should have foreseen plaintiff's damages, whether or not it actually did foresee them. Pl. Response at 38–41. Damages that are " 'natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have reasonably foreseen' " them are foreseeable. *LaSalle Talman,* 45 Fed.Cl. at 87 (quoting *Chain Belt,* 115 F.Supp. at 714). To this end, evidence that a knowledgeable person in defendant's position should have anticipated plaintiff's damages indicates that those damages were foreseeable.

 The question of foreseeability is related to the purpose of the contract. In *Wells Fargo,* the Court of Appeals for the Federal Circuit rejected lost profits damages but upheld damages based on a writeoff of indebtedness due to the government's failure to issue a guarantee. 88 F.3d at 1023–24. The court reasoned that the missing guarantee and the resulting writeoff were the subject of the principal contract, whereas the lost profits claims were the subject of " 'independent and collateral undertakings.' " *Id.* at 1023 (quoting *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357–58 (1951)). In *Glendale Federal Bank, FSB v.*

*United States,* 43 Fed.Cl. 390 (1999), *appeal docketed,* No. 99–5113 (Fed.Cir. Jun. 21, 1999), this court addressed a foreseeability question similar to the dispute at issue here and, relying on *Wells Fargo,* concluded that the purpose of the SM–1 forbearance was to give the plaintiff the ability to leverage its capital and gain profits thereby. *Id.* at 398–99.

Plaintiff has offered substantial evidence in support of its position. Plaintiff relies most heavily on the testimony of Mr. Gray who stated, when asked about "any other problems [he] might foresee which would result from a taking away of the capital credit," that he thought a variety of damages could result:

> When there's this huge chunk that is taken out from your regulatory capital, you have to report it, and you either have to reduce your assets to come back into regulatory compliance—and, by the way, it's hard to do that quickly without taking further losses. So everyone comes to know that you are an institution that may be hovering around a net worth that they were never used to before, and shareholders know that you can have problems with the regulators at that time, and also, this gets you publicity which causes you to have to pay more for your deposits and probably more for your advances from the Federal Home Loan Banks.

Def.App. v.1 at 850–51. Defendant argues that Mr. Gray's understanding of the term "capital credit" is unclear, since it is possible that Mr. Gray understood the deposing attorney to mean the cash assistance itself rather than FHLBB's forbearance, which granted permission to count the cash infusion as goodwill for regulatory capital purposes. Def. Reply at 92–94. While Mr. Gray appeared to be assuming at an earlier point in his deposition that "capital credit" referred to the cash itself rather than the accounting treatment of the forbearance, *see* Def.App. v.1 at 846, here he appears to be talking about the accounting treatment rather than the cash. His deposition testimony identified the foreseeable damages as arising from a sudden change in a thrift's capital/asset ratio and the need to return to compli-

ance quickly, which supports plaintiff's proffered damages model. Def.App. v.1 at 850–51. That Mr. Gray identifies the loss of regulatory capital as the source of damages is significant, moreover, because the capital credit that was the subject of the breach was valuable solely as regulatory capital; cash, by contrast, is includible in assets, not in regulatory capital. *See, e.g., id.* v.2 at 1170 (pre–1989 TFR with line item for "Cash and Demand Deposits" in the section entitled "Assets," but no line item mentioning cash in the section entitled "Regulatory Net Worth"); *id.* at 1248–49 (1989 TFR with line item for "Cash and Noninterest–Earning Deposits" in the section entitled "Assets," but no line item mentioning cash in the section entitled "Calculation of Regulatory Capital"). Had Mr. Gray been referring to the cash in this discussion of the "capital credit," he would not have stated that "a huge chunk is taken out from your regulatory capital." *Id.* v.1 at 850. Mr. Gray's testimony, then, supports the view that the government could have foreseen plaintiff's damages at the time of contracting, had it also foreseen the breach.

Other government officials confirmed this view. Thurman Connell, former Director of FSLIC, testified that he "would have expected" an acquiring institution given a capital credit forbearance to leverage against that credit and, further, that depriving an institution of a capital credit would force it to shrink its asset base. Pl.App. v.2 at 1028. Since plaintiff's lost profits and replacement cost theories of damages both rely on its reduced ability to leverage its regulatory capital and consequent forced shrinkage, Mr. Connell's testimony is probative of foreseeability. Mr. Connell's testimony was not controverted by defendant.

Guy Schlaseman, another former FSLIC official, testified that a capital contribution "could be converted to interest-bearing assets," and that losing the contribution could require an institution to reduce its assets. Pl.App. v.1 at 739, 756–57. Defendant contends that Mr. Schlaseman's use of "could" rather than "would" argues against foreseeability. Def. Reply at 95–96. The use of "could" suggests that Mr. Schlaseman did not actually foresee plaintiff's damages, but it

also indicates that he viewed them as damages that should have been foreseen. Mr. Schlaseman's testimony therefore supports plaintiff's argument.

As plaintiff has argued, the forbearance had no purpose other than permitting leverage (either directly or by enabling plaintiff to leverage other assets), so FHLBB could not reasonably have expected that plaintiff would not use it for that purpose. Pl. Response at 39–41. Under *Wells Fargo* and *Glendale,* a showing that the claimed damages were closely related to the purpose of the contract is strong evidence that the damages were reasonably foreseeable. 88 F.3d at 1023, 43 Fed.Cl. at 398. Likewise, the *LaSalle Talman* court held, relying on *Glendale,* that lost goodwill could foreseeably result in lost profits, and rejected an argument that a highly troubled thrift's survival was too uncertain to make its continuing need for the forbearance foreseeable. 45 Fed.Cl. at 88–89. In this case, where the record does not indicate any doubt that plaintiff would remain a going concern, plaintiff's continuing need for regulatory capital should have been obvious.

Defendant points to contemporaneous statements in plaintiff's business plans disavowing an intent to leverage all of plaintiff's capital as evidence that the damages plaintiff alleges were not reasonably foreseeable. Def. Reply at 97–99. Since plaintiff intended to maintain a capital/asset ratio that was significantly greater than the regulatory requirement, defendant argues, it was not reasonably foreseeable that depriving plaintiff of some capital would cause it to fall out of regulatory compliance (thereby forcing plaintiff to raise capital quickly and sell assets). *Id.* The significance of plaintiff's $299 million capital contribution, however, was that it provided a cushion for plaintiff in the event that other problems put pressure on its capital/asset ratio. Pl. Response at 43. If those other events were entirely unforeseeable, that would argue against the foreseeability of plaintiff's damages as well. However, the court finds that a circumstance such as an economic downturn which made it difficult for plaintiff to raise capital was foreseeable to defendant. Indeed, an OTS official, Mi-

chael Buting, testified that having more capital than the regulatory minimum was desirable for thrifts in the event of a recession, since loan defaults would put a strain on capital. Pl.App. v.4 at 2719. It was also foreseeable that capital requirements would change. As the Supreme Court plurality in *Winstar* recognized, regulatory capital requirements in this period changed frequently enough that regulators were aware of the possibility that plaintiff would have to meet a higher capital/asset ratio with its existing capital. 518 U.S. at 906–07, 116 S.Ct. 2432. The value of maintaining a "capital cushion" is unquestioned by defendant, and plaintiff has shown that it was foreseeable that subtracting the capital contribution from regulatory capital could cause plaintiff to fall out of regulatory compliance, even if plaintiff was not fully leveraged at the time of contracting.

Defendant cites the testimony of Mr. Smuzynski as evidence that defendant could not have been expected to foresee that plaintiff would try to leverage its regulatory capital. Def. Reply at 94–95. Mr. Smuzynski, when asked about whether he expected that plaintiff would leverage its capital contribution, stated that FHLBB would not be inclined to permit an institution to leverage its capital significantly when a substantial percentage of that capital consisted of goodwill since it would be "difficult" to do so safely. Pl.App. v.2 at 792–93. Mr. Smuzynski also acknowledged, however, that government regulators approved plaintiff's business plans, and that he expected plaintiff to leverage its regulatory capital to the extent indicated by its business plans. *Id.* Plaintiff's business plan for 1988 projected an increase in assets and a decrease in the ratio of regulatory capital to assets. *See* Def.App. v.4 at 2726 (plaintiff's December 1987 business plan, planning increase in total assets from $11,663,461 in 1987 to $12,511,005 in 1988); *id.* at 2727 (same business plan, planning decrease in regulatory capital ratio from 8.97% to 8.65%). The only way that plaintiff could have attained the growth projected in its business plan without leveraging the capital credit was to add more regulatory capital to its balance sheet—enough to maintain or increase its regulatory capital ratio. Since plaintiff clearly did not intend any such

thing, a regulator reviewing plaintiff's business plan for 1988 should have concluded that plaintiff intended to leverage the capital credit. The important question is not whether it was desirable for a thrift to approach the limits of, or violate, capital ratios, but whether it was foreseeable that circumstances could force a thrift to do so. In this case, the circumstances that could lead to that result were all foreseeable.

Several of defendant's arguments on foreseeability in fact relate more closely to causation. For example, defendant argues that because a recession began shortly after FIRREA passed, it is difficult to say whether plaintiff's problems arose more from the recession or from the breach. Def. Mot. at 75. Defendant also argues that the loan losses that plaintiff sustained as a result of the recession contributed to plaintiff's difficulties in meeting regulatory requirements after the breach. *Id.* Defendant argues as well that non-breaching parts of FIRREA—specifically, the changed capital requirements, which would have pushed plaintiff toward a regulatory violation even if the breach had not happened—contributed to the pressure on plaintiff's capital/asset ratio. *Id.* Whether the breach did in fact cause plaintiff's damages—that is, whether it was a sufficiently "substantial factor" in the claimed damages to be considered the cause of those damages, *see California Federal Bank v. United States,* 43 Fed.Cl. 445, 450 (1999) (quoting 5 Arthur L. Corbin, *Corbin on Contracts* § 999 at 25 (1964))—is a separate question addressed below. Defendant also argues that, in light of plaintiff's 1987 and 1988 business plans, it is unreasonable to assume that, had there been no breach, plaintiff would have leveraged its capital as extensively as it now claims. Def. Mot. at 77–79. That argument, however, relates more to the accuracy of plaintiff's lost profits model (since that model relies on plaintiff's "but for" scenario) than to whether plaintiff's damages were foreseeable.

### 3. Conclusion

Because the possibility of damages and the circumstances that could give rise to them were demonstrably foreseeable to FHLBB at the time of contracting, there is no genuine

issue of material fact remaining on foreseeability. *See Concept Automation, Inc. v. United States*, 41 Fed.Cl. 361, 370 (1998) (granting plaintiff summary judgment based in part on finding that its damages were foreseeable). For the foregoing reasons, plaintiff's Cross–Motion for Summary Judgment is GRANTED with respect to foreseeability, and defendant's Motion for Summary Judgment is DENIED with respect to foreseeability. This judgment does not address any other aspect of plaintiff's damages model, including proof of causation or the accuracy of plaintiff's projections.

### D. Nature and Scope of Breach

The parties also dispute what exactly constituted the breaching act. Specifically, defendant argues that FIRREA itself was the breach, and that plaintiff must therefore subtract any benefits conferred by FIRREA from its calculation of damages. Def. Mot. at 70–73; *see Erwin v. United States*, 19 Cl.Ct. 47, 56 (1989) (plaintiff must account for expenses avoided in calculating damages for breach of contract); Charles T. McCormick, *Handbook on the Law of Damages* 146 (1935) ("[I]f any benefit or opportunity for benefit appears to have accrued to the plaintiff by reason of defendant's breach of duty, a balance must be struck between benefit and loss, and the defendant should be charged only with the difference."). Plaintiff responds that the OTS regulations implementing FIRREA constituted the breach, not FIRREA itself, so any benefits to plaintiff attributable to the passage of FIRREA are irrelevant to this court's inquiry. Pl. Reply at 60. Alternatively, plaintiff argues that only the provisions of FIRREA that actually breached the contract can be considered the breaching act, and that it derived no benefit from those provisions. Pl. Response at 84. Defendant has moved for summary judgment on this issue.

The court agrees with defendant that FIRREA breached the contract, and with plaintiff that only the provisions of FIRREA that actually breached the contract are properly included within the scope of the breach. For purposes of this motion, the court does not decide whether and to what extent plaintiff derived any benefits from the breach.

Summary judgment is appropriate when, on the matter that is the subject of the motion, there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). The question of the nature and scope of the breach is purely a question of law. *Northern Helex Co. v. United States*, 225 Ct.Cl. 194, 634 F.2d 557, 563 (1980) (stating that damages should be reduced by "the extent that the breach itself made [the plaintiff's property] more valuable to the plaintiff," but that damages should not be reduced by "increases in the value of [the plaintiff's property] that either resulted from the performance of the contract or occurred after the breach but not because of it"). The legal question is what, considering the terms of the contract and the terms of FIRREA and its implementing regulations, is deemed the breaching act.

#### 1. Nature of Breach

■ Plaintiff's argument that the breach was effected by the regulations, rather than by FIRREA itself, depends to a great extent on its contention that its RAP goodwill was unrelated to the treatment of supervisory goodwill and other intangibles and therefore did not amortize. Plaintiff contends that FIRREA "did not compel" the elimination of RAP goodwill from capital because it did not explicitly refer to capital contributions, and that the breach only occurred when OTS "chose to include capital credits in qualifying supervisory goodwill." Pl. Reply at 66–67. But FIRREA itself explicitly addresses the treatment of intangible assets in its definition of core capital. FIRREA excluded from core capital "any unidentifiable intangible assets," an exclusion that mirrors the FASB 72 term for goodwill created by a merger. *See* 12 U.S.C. § 1464(t)(9)(A); *compare id.* § 1464(t)(9)(C) (defining tangible capital as "core capital minus any intangible assets") *with* Def.App. v.2 at 1100 (identifying excess of liabilities over assets acquired as "unidentifiable intangible asset"). Plaintiff's RAP goodwill was an intangible asset within the ambit of the FASB 72 requirements. FIR-

REA's reference to those requirements in its reference to "any unidentifiable intangible asset" meant that plaintiff's contract was within the scope of the statute. 12 U.S.C. § 1464(t)(9)(A). It is true that the OTS regulations included explicit references to FSLIC capital contributions (whereas FIRREA itself had not), but the explicit regulatory reference does not require the conclusion that such contributions were not within FIRREA's scope. 12 C.F.R. § 567.1(w) (1990) (including in the definition of "qualifying supervisory goodwill" "[a]ny unamortized goodwill (FSLIC Capital Contributions, as reported in the September 30, 1989 Thrift Financial Report")); see also 12 C.F.R. § 567.1(a) (including in the definition of "adjusted total assets" "[t]he remaining goodwill (FSLIC Capital Contributions) resulting from prior regulatory accounting practices"); 12 C.F.R. § 567.5(a)(1)(v) (including in the calculation of core capital "the remaining goodwill (FSLIC Capital Contributions) resulting from prior regulatory accounting practices"). That the regulations made the reference to capital contributions as a parenthetical addition to the definition of supervisory goodwill, rather than in a separate section, indicates that OTS's intent was to clarify FIRREA's effect on the treatment of FSLIC capital contributions.

Plaintiff refers to a statement in the *Winstar* plurality opinion that suggests that the breach was the promulgation of the OTS regulations, not the passage of FIRREA. Pl. Reply at 60; *Winstar*, 518 U.S. at 870, 116 S.Ct. 2432 ("We accept the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA ... the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth."). That statement was an adoption, without further explanation or analysis, of a similar statement in the Federal Circuit's *en banc* opinion. *Id.;* 64 F.3d at 1538 ("FIRREA did not specifically cover capital credits or otherwise exclude FSLIC cash contributions from capital .... The OTS, however, equated capital credits with 'qualifying supervisory goodwill' within the meaning of the statute and promulgated a regulation that treated capital credits in the same manner as supervisory goodwill."). The trial court had concluded in two separate opinions (consolidated for appeal), however, that FIRREA itself breached the plaintiffs' contract, and had not mentioned the implementation of OTS regulations as a breaching act. *See Statesman Sav. Holding Corp. v. United States,* 26 Cl.Ct. 904, 913 (1992) (noting that "[b]y enacting FIRREA, the government altered existing regulations," which "constituted a breach of contract" (citations omitted)); *Winstar v. United States,* 25 Cl. Ct. 541, 549 (1992) ("[I]n enacting FIRREA the government did in fact breach its contract with plaintiffs"). The original panel decision of the Federal Circuit also concluded that the relevant act was the passage of FIRREA, although it found that FIRREA had not breached the contract. *Winstar,* 994 F.2d 797, 805 (Fed.Cir.1993) (finding that "FIRREA charged OTS with developing and implementing" capital standards, but "severely restricted the agency's discretion to set these standards").

Notwithstanding their references elsewhere to the regulations, both the Supreme Court plurality and the *en banc* Federal Circuit repeatedly referred to FIRREA in their discussions of the application of the sovereign acts doctrine, suggesting that the statute could be considered the breaching act. *See* 518 U.S. at 900, 116 S.Ct. 2432 (plurality opinion of Souter, J.) ("[I]t is impossible to attribute the exculpatory 'public and general' character to FIRREA."); *id.* at 902, 116 S.Ct. 2432 ("FIRREA had the substantial effect of releasing the Government from its own contractual obligations."); 64 F.3d at 1548 ("[T]he relevant sections of FIRREA are not public and general sovereign acts."); *id.* at 1550 ("[T]he portions of FIRREA at issue in this case are not any less directed at thrifts that had supervisory mergers because they are part of 'comprehensive' legislation.").

Plaintiff cites a decision regarding the application of the statute of limitations to various *Winstar* plaintiffs, which held that FIRREA was an "anticipatory" rather than an "actual" breach of contract. Pl. Reply at 61; *Plaintiffs in Winstar–Related Cases v. Unit-*

ed States, 37 Fed.Cl. 174, 183–84 (1997). Owing to the nature of the inquiry (which was a determination on the statute of limitations), the court was more focused on the timing of the breach. In that context, the court found that OTS's postponement of the effective date of the statute changed the accrual of the cause of action, for purposes of the statute of limitations. *Id.* at 183. The decision appeared to assume, however, that the substance of the breach was contained in FIRREA. *Id.* at 184. In the light of the majority of references to the subject in the authorities, the court finds that FIRREA was the substantive source of the breach of plaintiff's contract.

### 2. Scope of Breach

 Under the doctrine of "sovereign acts," the government may avoid contractual liability for acts that are "public and general in nature, not private and contractual." *Orlando Helicopter Airways, Inc. v. Widnall,* 51 F.3d 258, 262 (Fed.Cir.1995). The doctrine includes "acts taken in its sovereign capacity for the public good." *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir. 1990); *see also Walter Dawgie Ski Corp. v. United States,* 30 Fed.Cl. 115, 132 (1993). Governmental actions that are characterized by a "principal and primary focus on the relationship with the injured party," however, are not sovereign acts and give rise to full contractual liability. *Walter Dawgie,* 30 Fed. Cl. at 132. The *Winstar* plurality held that the relevant portions of FIRREA "had the substantial effect of releasing the Government from its own contractual obligations" and therefore did not qualify as a sovereign act. 518 U.S. at 902, 116 S.Ct. 2432.

 The sovereign acts doctrine requires that the breaching act be viewed as the particular provisions of FIRREA causing the breach of plaintiff's contract, rather than the entirety of the statute. That Congress chose to include other provisions within the same piece of legislation as those provisions that breached plaintiff's contract does not make the other provisions part of the breaching act. The *Winstar* plurality acknowledged the necessity of this distinction in rejecting the argument that the breach was "public and general" simply because it was included in a large and complex piece of legislation. The Court stated that the government's contracting power would "not count for much" if embedding a breach in a complicated statute could excuse it. 518 U.S. at 903 n. 52, 116 S.Ct. 2432 (plurality opinion of Souter, J.). The court believes that the converse is also true—the same complex legislation that happened to be passed as a unitary whole cannot be considered focused on the breaching of an individual contract solely because one of its provisions is so focused. The *en banc* Federal Circuit in *Winstar* made it clear that it was discussing only the relevant provisions of FIRREA, not the entirety of the statute. 64 F.3d 1531, 1548 (Fed.Cir.1995) (en banc) (rejecting government's argument that FIRREA was "public and general" on grounds that "the relevant sections of FIRREA are not public and general sovereign acts"), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Other courts dealing with the "sovereign acts" doctrine have made a similar distinction. *See Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 817 (1978) (holding that the actions "were not actions of public and general applicability, but were actions directed principally and primarily at" plaintiffs); *Walter Dawgie,* 30 Fed.Cl. at 131–32.

The "primary focus" approach to the sovereign acts doctrine necessitates that the act in question be considered the breaching provisions of FIRREA, not the entirety of the statute. The elimination of plaintiff's RAP goodwill from regulatory capital may be fairly characterized as directed at plaintiff, or those in the same situation as plaintiff, but the rest of the statute was not so directed. The *Winstar* plurality opinion found that Congress had intended to abrogate supervisory merger agreements through its adoption of new capital requirements, and noted that the lower courts that had already addressed the question had agreed. 518 U.S. 839, 900 n. 47, 116 S.Ct. 2432 (plurality opinion of Souter, J.). While the plurality opinion in *Winstar* did not explicitly draw the distinction between the breaching provisions and the remainder of the statute, nothing in that decision turned on the scope of the breach since the Court was not addressing damages

issues at that time. In the court's view, the scope of the breach most consistent with the application of the sovereign acts doctrine is a scope limited to the FIRREA provisions particularly breaching plaintiff's contract.[24]

Defendant argues that the beneficial effects of FIRREA's capital standards should be offset against plaintiff's damages. Def. Reply at 55. This argument may be thought to have some added force because the breaching provisions were included within provisions that also established the capital ratios. The revision of the capital standards did not, however, breach defendant's contract with plaintiff. Nothing in the contract referred to the existing capital/asset ratios as an aspect of defendant's performance. The breaching and non-breaching portions of 12 § U.S.C. 1464(t) are conceptually distinguishable, since it was possible for Congress to establish the new capital ratios without excluding plaintiff's capital contribution from regulatory capital. The court sees no reason why the breaching and non-breaching provisions should be conflated.

Nor does the court find it reasonable to consider, in conducting a damages analysis, the benefit to plaintiff of the abrogation of other thrifts' contracts by the breaching provision, as defendant would have this court do. Def. Reply at 55–56. The performance of plaintiff's contract was not affected by defendant's treatment of other thrifts. Just as non-breaching provisions of FIRREA were sovereign acts unrelated to FHLBB's obligations as contractor in this case, the effect of the pertinent provisions on other parties cannot be considered part of defendant's non-performance of this contract.

Defendant argues that the resulting scenario—FIRREA with a grandfathering clause specifically excluding plaintiff from the breaching provisions—is unrealistic, Def. Re-

ply at 52–54, but realism is not the issue here. For purposes of determining what constituted the breach, the question is which of defendant's acts breached an element of its contract with plaintiff.[25]

### 3. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is GRANTED with respect to its claim that FIRREA, rather than the implementing regulations, constituted the breach, and DENIED with respect to its claim that the entirety of FIRREA constituted the breach. Specifically, the court finds that the scope of the breach was limited to the accelerated phaseout of the capital contribution forbearance as to plaintiff. The provable benefits to plaintiff, if any, of that phaseout may be offset against plaintiff's damages from the phaseout.

### E. Lost Profits

#### 1. Causation and Reasonable Certainty

▪ A plaintiff alleging expectancy damages in the form of lost profits must demonstrate causation and reasonable certainty. *Wells Fargo*, 88 F.3d at 1023 (Fed.Cir.1996); *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438 (1961); *Chain Belt*, 115 F.Supp. at 714 (1953); *Energy Capital Corp. v. United States*, 47 Fed.Cl. 382, 393 (2000). Defendant has moved for summary judgment on the lost profits element of plaintiff's damages claims, arguing that plaintiff has not shown its ability to prove damages with adequate certainty nor shown sufficient evidence of causation to survive summary judgment. Def. Mot. at 38–63.

▪ The Court of Appeals for the Federal Circuit has denied as "too uncertain and remote" lost profits damages allegedly re-

---

**24.** In the only published opinion to decide the scope of the breach in the context of a *Winstar*-related damages inquiry, Judge Bruggink considered and rejected an argument that the breach consisted of the entirety of FIRREA. *LaSalle Talman*, 45 Fed.Cl. at 82–83. In that case, the government offered an event study analysis purporting to show that the plaintiff's stock increased in value directly after the passage of FIRREA and that the statute therefore benefited the plaintiff. *Id.* The court rejected this ap-

proach and held that the benefits resulting from non-breaching portions of FIRREA were irrelevant to the damages inquiry. *Id.* at 83.

**25.** With respect to explaining its expectancy damages, on the other hand, plaintiff bears the burden of propounding a realistic but-for scenario, and the court will consider in that context whether plaintiff's model, including its non-breaching FIRREA, is plausible.

sulting from the government's failure to honor a loan guarantee to a bank, on grounds that profits that might have been earned on "collateral undertakings" are not recoverable. *Wells Fargo*, 88 F.3d at 1023 (Fed.Cir.1996) (quoting *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353, 357–58 (1951)). The *Wells Fargo* court relied on other cases in which government contractors had lost the ability to pursue collateral business because of the government's breach of contract. 88 F.3d at 1023. For example, in *Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741 (1980), the plaintiff was unable to obtain the issuance of bonds on its behalf as a result of the government's breach, which prevented it from entering into other, unrelated contracts. Likewise, in *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 720–21 (1975), the Court of Claims denied a claim for the costs of the operation of the plaintiff's plant for unrelated work up to the end of the contract term, on grounds that the damages were "too remote, speculative, and consequential." *Id.* at 721. The court's opinion in *Wells Fargo* distinguished several cases where the relationship between the breach and the lost business was closer. In *Neely*, for instance, the plaintiff was given damages when the government breached a contract to lease land for mining. 285 F.2d at 442. The *Wells Fargo* court noted that the profits lost in *Neely* were "profits on the use of the subject of the contract itself" and were "proven with certainty." 88 F.3d at 1023. The *Wells Fargo* court also observed that "the only purpose of the contract in *Neely* ... was for the plaintiff to make profits on the subject of the contract." 88 F.3d at 1023.

In light of the authorities, a threshold inquiry here is whether the relationship between the claimed lost profits and the breach was sufficiently close that the business opportunities adversely impacted by the breach could be considered the "subject of the contract" rather than "collateral undertakings." In *Glendale*, the court considered *Wells Fargo* and other cases in connection with the plaintiff's lost profits claims, and held that the evidence showed that the lost profits in question were sufficiently related to the purpose of the contract that the certainty concerns discussed in *Wells Fargo* did not bar

recovery. 43 Fed.Cl. at 397–99. Specifically, the *Glendale* court found that the purpose of the contract was to give the plaintiff a leveraging device that would generate profits. *Id.* at 398–99. Here, the court has already found, addressing the foreseeability of plaintiff's damages, that defendant should have known that plaintiff intended to leverage its forbearance. Foreseeability and the purpose of the contract are closely related but still separate questions. The *Wells Fargo* court found, for example, that even though the lost profits damages requested by the plaintiff were sufficiently related to the purpose of the contract to be recoverable, the damages were not foreseeable to the defendant at the time of contracting. 88 F.3d at 1023–24.

### 2. Plaintiff's Model

When, as here, damages are based on a hypothetical model, constructing a hypothetical that legitimately differs from the real world in only one respect—by undoing the breach—is a challenging exercise. A plaintiff positing a "but for" model must show that the breach caused the claimed differences between the hypothetical and the actual.

Plaintiff relies on the analysis of its expert, Dr. David L. Smith, to support its claim of lost profits damages. Def.App. v.1 at 157–278. Dr. Smith concludes that plaintiff would have earned an additional $499.8 million in profits from 1989 to 1997 had defendant not breached the contract. *Id.* at 162. The projection includes $289.2 million of profits that, Dr. Smith contends, would have been earned by $4.5 billion in assets that plaintiff divested, and $210.6 million of profits from assets of $4.4 billion, the acquisition of which was forgone—in both cases as a result of the breach and the consequent unavailability of regulatory capital. *Id.* at 165–171. The divested assets included deposit franchises in San Diego and the Central Valley of California, along with mortgage loans of various types. *Id.* at 165–66. Dr. Smith's "but for" model of damages posits that plaintiff would not have sold the deposit franchises and would not have sold any of the loans. *Id.* at 165–67. Regarding the forgone assets, the model assumes that, in the "but for" world, plaintiff would have originated an ad-

ditional $4.4 billion in single-family adjustable-rate mortgages (ARMs) between 1991 and 1997 to replace portfolio runoff.[26] *Id.* at 169. Dr. Smith also posits that plaintiff would have earned $151.5 million in 1998 and 1999, after its 1998 acquisition by H.F. Ahmanson and H.F. Ahmanson's subsequent acquisition by Washington Mutual. *Id.* at 177. Dr. Smith's model applies Washington Mutual's pretax return on assets to the additional assets that, Dr. Smith contends, plaintiff would have had but for the breach. *Id.*

### 3. Defendant's Argument

Defendant, relying in part on its own experts, argues that Dr. Smith's model is overly speculative and rests on invalid assumptions. Def. Mot. at 34–37; *see also* Def.App. v.1 at 579–80; *id.* at 696–702; *id.* v.5 at 4179– 4200. Defendant contends that plaintiff would not, as Dr. Smith assumes, have maintained its size at $13 billion during the period 1989 to 1997, given that other large thrifts shrank over the same period. Def. Mot. at 40–42. Defendant also argues that plaintiff would have sold some of the loans it sold whether or not FIRREA had passed and that the assumption that the divestiture of $4.5 billion in assets was caused by the breach is invalid. *Id.* at 43–47. Defendant attacks Dr. Smith's assumption that plaintiff would have sold off its high-risk and problematic assets and retained its least risky and most profitable assets. *Id.* at 48–50. Defendant argues that plaintiff would have sold the deposit franchises in San Diego and Central Valley whether or not the government breached its contract. *Id.* at 50–54. Regarding forgone assets, defendant contends that plaintiff would not have been able to originate $4.4 billion in additional loans, given the declining market for mortgage loans and the declining market share of the thrift industry, and that it is also unrealistic to assume that all of the additional originations Dr. Smith's model contemplates would have been single-family ARMs. *Id.* at 54–63. Defendant also contends that it is improper to assume that plaintiff would have retained the benefits of the Assistance Agreement after plaintiff's acquisition by H.F. Ahmanson in 1998, since the Assistance Agreement provides that it may not be assigned to any other party without FSLIC's consent. *Id.* at 94 n. 42; Def.App. v.1 at 561.

Defendant's experts also argue that certain assumptions underlying Dr. Smith's model are invalid. For example, the report of defendant's expert, Dr. William Hamm, states that, contrary to Dr. Smith's model, plaintiff would not have been able to increase substantially its ARM originations over the volume it did originate between 1989 and 1997, given market conditions. Def.App. v.5 at 4184–87. Dr. Hamm views Dr. Smith's assumption that plaintiff would not have made the loan sales it did in the "but for" scenario as unsupported. *Id.* at 4181–84. Defendant argues as well that a variety of other factors affected plaintiff's profits during the relevant period, and that plaintiff has not shown a sufficiently close causal relationship between the breach and its lost profits damages. Def. Reply at 58–59.

### 4. Expert Reports and Evidence in Dispute

Both defendant and plaintiff argue persuasively for the approaches adopted by their respective experts. Defendant argues, relying on its experts, that other factors, such as the recession in California, were primarily responsible for any losses or setbacks that plaintiff suffered between 1989 and 1993. Def. Reply at 58; Def.App. v.1 at 697; *id.* v.5 at 4187–89. Plaintiff contends, relying on its experts, that the timing of its shrinkage and its performance relative to other large thrifts at this time indicate that the breach, rather than any other causal factor, is primarily responsible for its damages. Pl. Response at 56–57; *see also* Def.App. v.4 at 2639–40. Plaintiff argues that its "transformation from a healthy, expanding thrift into a rapidly shrinking thrift at almost exactly … the time of the breach" indicates causation. Pl. Response at 56. Defendant responds that other factors began to affect plaintiff at the same time as the breach, and that the timing itself cannot be viewed as probative of the

---

**26.** Plaintiff uses the term "runoff" to refer to the reduction of its loan portfolio due to the repayment in full of some of the loans, by scheduled or unscheduled payments. Def.App. v.1 at 169.

requisite causal relationship. Def. Reply at 58–59. Defendant also points to plaintiff's 1990 business plan, which, defendant asserts, was prepared after the breach but before the recession began, and which projects continued growth, as evidence that the recession rather than the breach caused plaintiff's shrinkage. Def. Reply at 58–59. The relevance of plaintiff's goals, as set out in its business plans, to the damages it sustained has not been established, however. Defendant also points to non-breaching provisions of FIRREA that eliminated other assets that had formerly been includible in capital. Def. Reply at 59. Specifically, defendant argues that FIRREA eliminated $232 million of non-contractual goodwill and $252 million of subordinated debt from regulatory capital. *Id.*

Each argument turns on disputed factual contentions regarding the state of the thrift industry, the effect of various non-breaching provisions of FIRREA on plaintiff, and the competitive environment in the relevant period. For example, defendant is correct that plaintiff cannot satisfy its burden of proof merely by showing a temporal relationship on a *post hoc, ergo propter hoc* theory. Def. Reply at 58. But the court cannot grant summary judgment to defendant merely on the showing that other apparently significant events were similarly close in time without a framework for evaluating the possible causal relationship between the juxtaposed events. Plaintiff and defendant have presented competing theories about what would have happened in the "but for" world, and the court cannot choose to credit one theory or the other. The court finds that there are disputed questions of fact as to the reliability of plaintiff's lost profits model that preclude summary judgment for defendant.[27]

### 5. 1998–99 Lost Profits

Defendant argues that plaintiff is not entitled to profits its acquiror would have earned in 1998 and 1999 because of a non-transferability clause in the Assistance Agreement. Def. Mot. at 94 n. 42. Plaintiff's claim of profits in 1998 and 1999 is based on the additional assets it claims that it would have had in those years. Def.App. v.1 at 177. Nothing in the Assistance Agreement prevents plaintiff from transferring assets to another thrift, whether or not plaintiff's possession of the assets can be attributed in some respect to the provisions of the Assistance Agreement; the clause merely provides that the Agreement itself, and the rights and obligations arising under it, may not be transferred without the consent of FSLIC. *Id.* at 561. Plaintiff is therefore not barred from presenting evidence of the profits it would have earned in 1998 and 1999.[28]

### 6. Conclusion

Summary judgment is appropriate when the nonmoving party fails to set out evidence of a material factual dispute. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 627 (Fed.Cir.1984). Plaintiff, the nonmovant on this issue, has furnished reports from experts that indicate the sort of evidence plaintiff would offer in support of its position. It is true that "speculative" and "conclusory" assertions are insufficient to defeat summary judgment. *Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042–43 (Fed.Cir.1994). But plaintiff's contentions are not simply conclusory. They are supported by experts' opinions that this court cannot credit or discredit without the aid of testimony or contrary evidence.

---

**27.** The court notes in addition that one of the premises for Dr. Smith's "but for" model is that plaintiff, absent the breach, would have had RAP goodwill in the amount of approximately $299 million as a permanent and nonamortizing addition to regulatory capital. Def.App. v.1 at 221. The court rejects this premise. *See* section B *supra.* The "but for" scenario proposed at trial to measure plaintiff's damages must therefore assume that plaintiff does amortize RAP goodwill.

**28.** The court notes the possibility that the non-transferability clause would have prevented plaintiff from transferring the nonamortized portion of the capital contribution to its acquiror, since the ability to credit the contribution toward plaintiff's regulatory capital was among plaintiff's rights under the Assistance Agreement. Whether OTS, as the successor to FSLIC, would have consented to the transfer is unclear and has not been addressed by the parties. This issue will need to be more fully addressed, either at trial or by another dispositive motion.

For the foregoing reasons, defendant's Motion for Summary Judgment is DENIED with respect to plaintiff's lost profits claims.

### F. Wounded Bank Damages

"Wounded bank" damages have been defined as costs resulting from a bank's "perilous financial condition" created by a breach of contract. *California Federal,* 43 Fed.Cl. at 448. Several other courts in *Winstar*-related matters have considered claims for wounded bank damages. *See LaSalle Talman,* 45 Fed.Cl. at 96–98; *California Federal,* 43 Fed.Cl. at 455–57; *Glendale,* 43 Fed. Cl. at 408. In *Glendale,* after a trial on damages, the court upheld a claim for wounded bank damages for a thrift that fell out of capital compliance as a result of a breach. 43 Fed.Cl. at 408. In *California Federal,* by contrast, the court, also after a trial on the merits, rejected a claim for wounded bank damages both because the claimed damages were "'too uncertain and remote'" to be considered attributable to the breach, and because other factors in the bank's poor performance could have raised its costs of doing business. 43 Fed.Cl. at 455 (quoting *Myerle v. United States,* 33 Ct.Cl. 1, 26, 1800 WL 2024 (1897)). The *California Federal* court also looked at the plaintiff's performance relative to other banks and found that the evidence did not show that the breach was clearly the cause of the damages claimed because the bank's cost of funds was not consistently higher when the thrift was short of capital. *Id.* at 456. The *LaSalle Talman* court, also addressing damages claims after a trial, upheld some aspects of the plaintiff's wounded bank damages and rejected others, applying the substantial factor standard of causation. 45 Fed.Cl. at 97.

Under the model proposed by Dr. Smith, plaintiff claims $139.6 million in wounded bank damages, $130.1 million of which represents plaintiff's greater costs of deposits attributable to the breach, and $9.5 million of which represents other increased operating costs attributable to the breach. Def.App. v.1 at 162. With respect to the claimed $130.1 million, plaintiff asserts that the breach caused negative publicity and that it was forced to offer depositors higher rates to overcome reports of its poor condition. Pl. Response at 86. With respect to the claimed $9.5 million, plaintiff contends, again relying on its expert, that it paid higher rates on advances from the Federal Home Loan Bank (FHLB) as a result of its reduced regulatory capital, that it paid higher deposit insurance premiums, and that OTS's operating assessments on plaintiff were greater, all as a result of the breach. Pl. Response at 90–91; *see also* Def.App. v.1 at 174. Defendant argues that plaintiff's theory of wounded bank damages is too speculative and lacks evidence of causation. Def. Reply at 83–84.

To defeat summary judgment, a nonmovant must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Once the moving party demonstrates the absence of an essential element of the nonmovant's case on which the nonmovant bears the burden of proof, the burden shifts to the nonmovant to demonstrate a genuine factual dispute with respect to that element. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *see also Arthur A. Collins, Inc. v. Northern Telecom Ltd.,* 216 F.3d 1042, 1046 (Fed.Cir. 2000) (stating that once the movant "discharge[s] its initial responsibility by stating the basis for its motion and pointing out that the evidence in the record would be insufficient to avoid a directed verdict," the nonmovant must "designate specific facts showing that there was a genuine issue for trial."). Defendant contends that plaintiff has presented insufficient evidence that the breach itself and the publicity arising from it, rather than the nonbreaching provisions of FIRREA and other factors, caused its wounded bank damages. Def. Mot. at 64–65; Def. Reply at 84–88. Plaintiff's principal response as to causation is an argument that it need only show that the breach was a "substantial" causal factor, not the "sole" cause, in its wounded bank damages, and that it has made such a showing. Pl. Response at 88; *see Energy Capital,* 47 Fed.Cl. at 395 ("[T]he Court will require the Plaintiff to prove that the breach was a 'substantial factor' in causing its losses."). The court finds that the

"substantial factor" standard is appropriate.[29] The court now considers whether plaintiff has furnished sufficient evidence to support a finding that the breach was, in fact, a substantial causal factor. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 (holding that the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case").

■ In support of its claims of $130.1 million in damages for greater costs of deposits, plaintiff has produced dozens of press clippings that, it argues, illustrate its "post-breach capital difficulties" sufficiently to prove that it was "wounded" in depositors' eyes. Pl. Response at 87. It is necessary to examine those clippings to determine whether, as a matter of law, they provide sufficient evidence to permit the finder of fact to conclude that the breach was a substantial factor in plaintiff's greater costs of deposits.

Many of the articles produced mention plaintiff only in passing, or in a context that sheds no light on its financial condition. *See* Def.App. v.5 at 4340 (reporting another thrift's plans to buy three of plaintiff's offices); *id.* at 4343 (quoting one of plaintiff's employees on state of thrift industry); *id.* at 4346–47 (quoting plaintiff's chairman on state of thrift industry); *id.* at 4362–63 (quoting plaintiff's chairman on state legislative proposal); *id.* at 4370 (noting that plaintiff wanted to delay the effects of the new capital and accounting standards); *id.* at 4375–76 (re-porting that plaintiff was represented by a lobbyist); *id.* at 4384 (reporting that plaintiff had elected a new director); *id.* at 4397–98 (quoting plaintiff's marketing director on inattention of depositors to interest rates); *id.* at 4399 (identifying different types of depositors and citing plaintiff's marketing director as source); *id.* at 4409 (reporting that plaintiff had reduced its minimum age for programs targeted to senior citizens); *id.* at 4411 (reporting the formation of plaintiff's holding company); *id.* at 4416 (reporting that plaintiff's second quarter reporting included revenue from realization of previously deferred income and included increased provision for loan losses); *id.* at 4457 (quoting plaintiff's president on trend toward thrifts' swapping branches and reporting that plaintiff had swapped branches with other thrifts); *id.* at 4484 (reporting that plaintiff's chairman and CEO had been elected to Savings Association Insurance Fund Industry Advisory Committee). Several other articles did not mention plaintiff at all. *See id.* at 4360–61, 4435–39, 4452, 4519–22.[30] The court sees nothing in these articles that could induce a depositor to withdraw his deposit from plaintiff, or a potential depositor to look elsewhere, since nothing in those articles addresses plaintiff's financial health.

Other articles reported on plaintiff's financial condition, but not in a significantly negative light. Several reported positive news from plaintiff. *See* Def.App. v.5 at 4335

---

**29.** The *California Federal* court adopted the "substantial factor" standard in the context of its general discussion of causation, 43 Fed.Cl. at 451, but stated, in its discussion of wounded bank damages, that the plaintiff was required to show that the damages resulted " 'inevitably and naturally, not possibly nor even probably' " from the breach. *Id.* at 455 (quoting *Myerle,* 33 Ct.Cl. at 27). It is not clear whether the *California Federal* court was articulating a special causation test for wounded bank damages or merely viewed the phrase "inevitably and naturally" as an elaboration of the content of the "substantial factor" standard. The *Myerle* decision did not involve a wounded bank claim. Requiring that damage flow "inevitably and naturally" from a breach has been viewed as too restrictive a standard for causation. *See Energy Capital,* 47 Fed. Cl. at 395. Several courts considering *Winstar*-related matters have applied the "substantial factor" standard when considering claims for expectancy damages. *See Bluebonnet,* 47 Fed.Cl. at 173; *LaSalle Talman,* 45 Fed.Cl. at 97; *Glen-dale,* 43 Fed.Cl. at 399. The court follows that approach, absent authority requiring the application of a different standard to wounded bank damages.

**30.** The article appearing at pages 4519–22 of volume 5 of defendant's appendix to its motion for summary judgment on damages also appears, with one additional page, on pages 3612–16 of the same volume. Plaintiff has moved to strike the article as it appears on pages 3612–16, and the court grants the motion insofar as the article is offered for the truth of the matters asserted therein. *See* Appendix A. Because the article as it appears on pages 4519–22 was offered by plaintiff rather than defendant, because defendant has not moved to strike it, and because plaintiff is offering it for the impact on the reader rather than the truth of the matters asserted, the court considers the article in ruling on plaintiff's claim for wounded bank damages.

(quoting plaintiff's chairman as saying that plaintiff had "generated record loan volume on profitable terms"); *id.* at 4337 (reporting that plaintiff's total assets had increased and that its operating efficiency was high); *id.* at 4385 (same); *id.* at 4348, 4354 (reporting that plaintiff's net worth was well above average); *id.* at 4482 (reporting that plaintiff had successfully issued $52 million in subordinated debentures); *id.* at 4497, 4507 (reporting that plaintiff expected to comply with FIRREA's capital requirements in the fourth quarter and to reduce the amount of its nonperforming assets); *id.* at 4513 (quoting plaintiff's spokesman as saying that plaintiff would meet all the new capital requirements and was reducing its nonperforming assets); *id.* at 4517, 4518 (reporting that Standard & Poor's had raised its ratings on plaintiff's certificates of deposit and subordinated debt, citing improved asset quality and capital levels and lower risk). These reports suggest that the accounts of plaintiff's performance were positive in certain respects.

A number of the reports that did shed unfavorable light on plaintiff did so well before the breach occurred, and attributed the losses to factors unrelated to the breach. *See* Def.App. v.5 at 4335 (reporting that plaintiff's earnings for the fourth quarter of 1988 were down); *id.* at 4336–39 (reporting that earnings for the fourth quarter of 1988 were down and that the cost of deposits was up); *id.* at 4341 (reporting that plaintiff's profit for 1988 decreased by 16%); *id.* at 4364, 4366, 4377 (reporting in March and April of 1989 that plaintiff had closed nine mortgage offices, and that plaintiff's vice president had attributed the closures to unfavorable market conditions); *id.* at 4379 (warning that plaintiff's earnings for the first quarter of 1989 could be less than expected due to an increase in short-term deposit rates); *id.* at 4382 (reporting expert's estimate, in April of 1989, that plaintiff's earnings could be 30–40% lower than expected due to lower interest-rate spreads and lower prices for adjustable-rate mortgages); *id.* at 4385–88, 4389 (reporting in April of 1989 that plaintiff's earnings for the first quarter of

1989 had declined from a year earlier and quoting plaintiff's chairman as attributing the decline to the rising cost of deposits and to market conditions); *id.* at 4390 (reporting that plaintiff's net income and new loans for the first quarter of 1989 decreased from their level of a year earlier); *id.* at 4403 (reporting in June of 1989 that plaintiff had discontinued its low initial rates on loans); *id.* at 4413 (reporting that plaintiff had exited the long-term apartment loan market in anticipation of FIRREA's new risk-based capital requirements).

Other unfavorable reports about plaintiff after the breach occurred also focused on issues unrelated to the breach. *See* Def.App. v.5 at 4440, 4442 (August 14, 1989 article identifying plaintiff as one of thrifts with more problem loans than tangible capital[31]); *id.* at 4475–76 (September of 1989 article explaining problems in junk bond market and noting that plaintiff was reducing its junk bond portfolio); *id.* at 4497, 4502–03, 4508 (reporting that plaintiff had delayed a stock offering because of market conditions and quoting an expert as saying of the offering that "[i]t's going nowhere, it's dead").

Many press reports also mentioned FIRREA's requirements as a source of concern for plaintiff. Several articles referred to plaintiff's capital restructuring plan—which included the elimination of goodwill from plaintiff's financial statements as the result of FIRREA and the attempt to raise new capital through the issuance of common and preferred stock—and stated that plaintiff anticipated losses in the immediate future as a result. *See* Def.App. v.5 at 4460–61, 4462–63, 4464, 4465, 4466–67, 4468–69, 4470–71, 4472–73, 4474, 4478–79. Later articles reported that plaintiff had, in fact, sustained a loss in the third quarter of 1989 and attributed the loss to the capital restructuring plan. *See id.* at 4485–88, 4489, 4490, 4491, 4492, 4493, 4494. But the elimination of goodwill that the articles mentioned in connection with the restructuring did not arise from the breach of contract, because the goodwill in question was not plaintiff's RAP goodwill. The

---

**31.** *Tangible capital was calculated, in this article, as of March 31, 1989, before the breach. The breach therefore did not cause plaintiff to be* included among thrifts with more problem loans than tangible capital.

amount of the goodwill eliminated was $242 million, according to the articles, and it arose from $196 million in retroactive adjustments to plaintiff's reports for the second quarter of 1989 and a $46 million writeoff for the third quarter of 1989. *See id.* at 4461, 4462, 4464, 4465. The retroactive $196 million adjustment did not reduce line C978, on which the capital contribution was reported; it reduced line A544, on which other types of goodwill were reported. *Compare* Pl.App. v.3 at 1848–49 (March 31, 1989 TFR reporting $232,075,000 on line A544 and $299,883,000 on line C978) *with id.* at 1860–61 (June 30, 1989 TFR reporting $41,874,000 on line A544 and $299,883,000 on line C978).[32] Likewise, the $46 million goodwill adjustment in the third quarter of 1989 did not reduce line C978, although it is not clear where on the TFR plaintiff did make that adjustment, since the amount reported on line A544 decreased by approximately $21 million. *Compare id.* at 1860–61 (June 30, 1989 TFR reporting $41,874,000 on line A544 and $299,883,000 on line C978) *with id.* at 1877–78 (September 30, 1989 TFR reporting $20,794,000 on line A544 and $300,568,000 on line C978[33]). Moreover, many articles reported that plaintiff intended to add $20 million to its general loan loss reserve, which contributed to its short-term loss. *See* Def. App. v.5 at 4461, 4463, 4465, 4468, 4470, 4472, 4474. The additions to the loan loss reserve did not, however, arise from the breach, since the breach did not determine the number of problem loans that plaintiff held. The developments that gave rise to the reports of plaintiff's losses in the third quarter of 1989 were therefore not caused by the breach.

None of the articles produced focus on FIRREA's exclusion of supervisory goodwill from capital, although several addressed the effect of the exclusion from capital of intangibles, including supervisory goodwill. One article published on April 28, 1989 discussed proposed versions of FIRREA that would have excluded supervisory goodwill from tangible capital and set the ratio of tangible capital to assets at 1.5%, eventually to rise to 3%.[34] The article reported that plaintiff's tangible capital ratio, when goodwill was excluded, was 1.884%. Def.App. v.5 at 4393. Similarly, an article published shortly before FIRREA passed reported that the proposed law, as approved by a joint House–Senate conference committee, would set a 1.5% tangible capital ratio that would eventually rise to 3%. *Id.* at 4417. The article also reported that plaintiff's tangible capital under the new law was 1.8%. *Id.* at 4421. Both of these articles certainly cast plaintiff in an unfavorable light, although each also mentioned thrifts that could not even meet the 1.5% requirement and hence were a worse risk than plaintiff. *See id.* at 4393 (reporting two other thrifts' tangible capital ratios as 1.329% and 1.159%); *id.* at 4421 (naming eight thrifts with tangible capital ratios between 1.1% and –23.4%). But the articles also made clear that plaintiff was not in immediate danger of falling out of capital compliance since it already had a tangible capital ratio that satisfied the new law. The articles, in stating that the requirement would eventually rise to 3%, raised the possibility that plaintiff would run afoul of the new requirements in several years (the articles did not describe the schedule of ratio

---

**32.** The difference in reported goodwill between the first and second quarters of 1989 is approximately $191 million, rather than $196 million. *Compare* Pl.App. v.3 at 1848–49 *with id.* at 1860–61. There is nothing in the record explaining this discrepancy. The TFR that plaintiff originally filed for the second quarter of 1989, but which is not included in the record, may have reflected an additional $5 million for reasons irrelevant to the present case. The discrepancy need not be sorted out at this point in the proceedings.

**33.** It is unclear why the amount reported on line C978 in the third quarter of 1989 increased slightly.

**34.** The article reports that the version passed by the U.S. House of Representatives required thrifts to meet a 1.5% tangible capital standard in 1990 without benefit of supervisory goodwill, and that the House standard would gradually rise to 3% in 1995. Def.App. v.5 at 4391. The article also reports that, under the version passed by the U.S. Senate, the 1.5% tangible capital requirement took effect in 1991. *Id.* at 4392. FIRREA as it was ultimately enacted put in place the 1.5% requirement for tangible capital in 1990, but it did not provide for the ratio to rise as envisioned by the House. *See* 12 U.S.C. § 1464(t)(1)(D) (requiring that OTS issue implementing regulations no more than 120 days after the passage of FIRREA).

changes). One of the articles also noted that accounts are insured by the federal government up to $100,000. *Id.* at 4392.

Plaintiff also produced two articles that reported on disputes over television advertisements by competing thrifts that suggested that plaintiff was at risk under the new capital requirements *See* Def.App. v.5 at 4400–01, 4414. However, those articles focused on the industry's and the government's reactions to the ads (namely, that they were misleading), but said nothing about the truth of the claims. *Id.* Both ads also reminded the reader that all deposits were insured. *Id.*

The only other report to mention tightened capital standards as a source of concern for plaintiff was an article published on December 17, 1989, which discussed the general state of the thrift industry. *See* Def.App. v.5 at 4514–16. The article mentioned FIRREA's new capital standards, and quoted plaintiff's president, reacting to an analyst's characterization of thrifts as "dinosaurs," as saying that "I like being part of the dinosaurs," comparing FIRREA to a "catastrophic event" that led to the extinction of the dinosaurs. *Id.* at 4515. In that case, plaintiff's president was referring to the entirety of the thrift industry, not to plaintiff in particular, as damaged by FIRREA. While it appears to the court that the effect on plaintiff's reputation of its president's making such a statement was unlikely to have been positive, the thrust of that particular statement and the entire article was that the industry as a whole was suffering, not that plaintiff was at particular risk.

In fact, few of the numerous articles that plaintiff submitted as evidence that it sustained negative publicity as a result of the breach actually support that conclusion. The court finds that the total negative impact of those articles, in light of the substantial reporting (including the substantial positive) reporting on plaintiff in the same period, must be viewed as minimal. Even assuming that negative publicity caused plaintiff's higher costs of deposits, the portion of that negative publicity that arose from the breach was so small, compared both to the rest of the unfavorable reporting and to all of the re-

ports about plaintiff, as to preclude a finding of causation.

Nor does plaintiff's other evidence establish a genuine issue of material fact as to causation. Plaintiff cites the testimony of a former OTS official who stated, relying on a study of thrift performance, that thrifts with "slim capital margins ... had to pay a little bit more for their deposits." Pl.App. v.4 at 2560. That undercapitalization and high deposit costs go together does not mean that the former caused the latter, however. And the fact that a study demonstrates a general association between these two factors does not prove causation in any particular case. Plaintiff cites the testimony of Mr. Gray, who stated that "when you have talk about an institution having problems with the regulator or with its insurer, and there is uncertainty, then obviously the cost of funds are probably going to rise." Def.App. v.1 at 852. Plaintiff has not shown that there was more than minimal publicity connected with plaintiff's problems that arose from the breach, however, and the general relationship as articulated by Mr. Gray cannot serve as evidence of what happened in this case. Another regulator cited by plaintiff testified that raising deposit interest rates "was a reaction to try to retain deposits when one was losing them," a general observation that likewise does not fill the evidentiary gap in this case. Pl.App. v.2 at 1415.

The only other evidence supporting a possible link between the breach and plaintiff's increased deposit costs (assuming that such costs were in fact higher) consists of conclusory assertions in an affidavit signed by plaintiff's vice president and in a report prepared by plaintiff's expert. *See* Def.App. v.1 at 172 (expert report) ("[P]ress accounts began to associate Coast with the weaker segments of the thrift industry that would likely face capital shortages in the future. Consequently, the cost of Coast's core deposits increased significantly"); *id.* v.4 at 3363 (vice president referring to breach and to "resulting public characterization of Coast as an under-capitalized (or only marginally capitalized) institution," which "has increased the rates Coast must pay on its deposit liabilities"). Conclusory assertions, whether by

experts or by other knowledgeable people, cannot by themselves create a genuine issue of fact sufficient to ward off summary judgment. *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed.Cir. 2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements."); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984) ("The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient."); *Redland Genstar, Inc. v. United States*, 39 Fed.Cl. 220, 232 (1997) (" '[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.' ") (quoting *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989)); *J.F. Allen Co. v. United States*, 25 Cl.Ct. 312, 325 (1992) (holding that "conclusory statements, without factual support" are of "no value to the court when deciding a summary judgment motion"). The proffered statements are unsupported by evidence, and they therefore do not create a genuine issue of material fact on this issue. In this case, the court has reviewed the evidence and does not find it sufficient to create a genuine issue as to whether the breach was a substantial factor causing plaintiff's greater costs of deposits.

A comparison of this case with *Glendale* supports the court's view of plaintiff's evidence. In *Glendale*, the government's breach caused the thrift to fall out of capital compliance. The *Glendale* court found that the thrift had established through expert testimony its difficulty in attracting and retaining depositors after the bank fell out of capital compliance. 43 Fed.Cl. at 408. Specifically, the court noted that the plaintiff's experts had testified about the effect of plaintiff's violation of capital requirements and OTS's issuance of a Prompt Corrective Action Directive on potential depositors. *Id.* While plaintiff here did eventually fall out of capital compliance for a brief period, the period during which plaintiff claims it was "wounded" in the eyes of depositors began

well before that violation, and in fact before the breach. DPFUF ¶ 69; Def.App. v.1 at 172–73. Plaintiff's wounded bank theory in this case requires the court to find that depositors reacted negatively to a small number of reports of the mere possibility of plaintiff's noncompliance with regulatory standards, and that the negative reaction was focused on the impact of one particular aspect of FIRREA which, as the press reports make clear, went largely unreported. This case is not *Glendale*.

None of the three other courts that have addressed wounded bank claims supports the approach that plaintiff advocates. The court in *LaSalle Talman* rejected the only aspect of the plaintiff's claim for wounded bank damages that related to the public perception of the plaintiff, finding that "factors general to the economy" were more likely responsible for the damages. 45 Fed.Cl. at 98. In *California Federal*, the court found it "far more likely that other factors caused the bank's problems, including its financial condition unrelated to the breach," and rejected the plaintiff's wounded bank claim. 43 Fed.Cl. at 456. Similarly, the evidence plaintiff has submitted in this case itself supports the view that other factors were responsible for its bad publicity. Finally, in *Castle v. United States*, 48 Fed.Cl. 187 (2000), the court considered a *Winstar*-related claim for damages. The damages model set out in *Castle* assumed that the bank in question would have received a capital infusion that would have enabled it to survive and earn additional profits, and the defendant argued that the assumption that the infusion would have happened was too uncertain to justify a finding of causation. *Id.* at 201, 202. After a trial, Judge Wiese rejected that argument based in part on the testimony of investors who were willing to make the necessary capital infusion. *Id.* at 203. Since plaintiff here has not provided any analogous testimony from depositors who were swayed by negative publicity, *Castle* does not support plaintiff's argument.

Plaintiff cites *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960), for the proposition that "[t]he defendant who has wrongfully broken a contract should not be

permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Id.* But it is not "by reason of the breach" that the proof of causation is difficult to substantiate; rather, as defendant argues, the multiplicity of reasons for any bad publicity associated with plaintiff, most of them unrelated to the breach, renders the issue uncertain. Def. Reply at 86–88. In *Locke*, the damages requested were lost profits damages for the termination of the government's agreement to list the plaintiff, a typewriter repair service, as one of the potential suppliers of that service. 283 F.2d at 524. The amount of lost profits was uncertain, since it could not be ascertained with precision what the plaintiff would have earned had the contract been continued. *Id.* In that case, the breach itself caused the uncertainty. The only way that the plaintiff could have determined its profits for the lost work was to have actually done it. *Id.* Here, the speculation is much more complicated, since undoing the breach involves isolating one causal factor among the many reasons for plaintiff's bad publicity. *Locke* does not support plaintiff's claim for wounded bank damages.

Defendant has demonstrated the absence of evidence on one aspect of causation—the link between the breach and plaintiff's damaged reputation—and plaintiff has not satisfied its burden of producing evidence sufficient to show that the breach was a "substantial factor" in causing damages from increased deposit costs. *See Arthur A. Collins*, 216 F.3d at 1046 (noting that summary judgment nonmovant must "designate specific facts showing that there [is] a genuine issue for trial").[35]

On plaintiff's other wounded bank damages claims—higher insurance premiums, higher rates on advances, and higher operating assessments—there is sufficient evidence of causation to defeat summary

judgment. Defendant acknowledges that these increased costs are attributable to unfavorable assessments of plaintiff by regulators, and that undercapitalization was a factor in those unfavorable assessments. Def. Mot. at 69. Whereas the claim of increased deposit costs depends on speculation about the public's perception of plaintiff, there is clear evidence that plaintiff's capital constraints contributed directly to regulators' unfavorable view of plaintiff, and therefore to its increased operating costs. *See* Def.App. v.3 at 2216–17, v.5 at 3807–08 (OTS assessments of plaintiff, concluding that plaintiff's capitalization is "inadequate"); *id.* v.5 at 4227 (quotation from FDIC assessment concluding that "inadequate capital" was among the factors contributing to plaintiff's "unsatisfactory condition"). The record also suggests, as defendant points out, that other factors, notably poor asset quality, contributed to regulators' unfavorable opinion of plaintiff. Def. Mot. at 69. One OTS report cited plaintiff's asset quality as "the single most important factor affecting its viability." Def.App. v.5 at 3798. As plaintiff argues, however, asset quality and undercapitalization are not entirely independent; if capital constraints prevented plaintiff from originating more loans, it could not reduce the ratio of nonperforming to performing assets. Pl. Response at 90–91. There are genuine factual disputes over whether plaintiff's capital constraints did, in fact, have the effect of constraining plaintiff's effort to improve asset quality, and over the importance of the factor of plaintiff's poor asset quality for regulators. Under the *Celotex* burden-shifting approach, 477 U.S. at 322–23, 106 S.Ct. 2548, defendant has not shown the absence of evidence supporting an element of plaintiff's case, since there is sufficient evidence in the record to establish a genuine issue of fact about whether capital constraints were a substantial factor causing the increased operating costs that plaintiff claims.

---

**35.** Defendant also argues that plaintiff's cost of deposits did not, in fact, increase relative to other thrifts, and that the comparison between plaintiff and the seven other thrifts selected by Dr. Smith is misleading. Def. Mot. at 68–69. Specifically, defendant contends that the other thrifts are not a representative sample of the thrift industry and that the cost indices used for

comparison introduce bias. *Id.* These arguments address the validity of plaintiff's approach to calculating its damages, a factual dispute that is not amenable to summary judgment. The court's grant of summary judgment to defendant on the question of causation renders the methodological dispute moot.

For the foregoing reasons, defendant's Motion for Summary Judgment is GRANTED with respect to plaintiff's claim of wounded bank damages in the form of increased deposit costs, and DENIED with respect to plaintiff's other claims for wounded bank damages.

### G. Failure to Mitigate

Defendant asserts, as a general defense to plaintiff's expectancy damage claims, that plaintiff cannot recover because it failed to mitigate its damages adequately. Def. Mot. at 80. Plaintiff responds that the capital markets were effectively closed to it at the relevant times, and that it did all it could to mitigate its damages. Pl. Response at 91–96. Defendant has moved for summary judgment on this issue.

A plaintiff in a contract action must take "reasonable steps" to mitigate its damages. *Kaiser Aluminum & Chem. Corp. v. United States,* 181 Ct.Cl. 902, 388 F.2d 317, 334 (1967); *see also Sun Cal,* 25 Cl.Ct. 426, 432 (1992). *Sun Cal* adopts the Restatement of Contracts's approach to mitigation of damages, which states in part that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." 25 Cl.Ct. at 432 n. 10 (quoting *Restatement (Second) of Contracts* § 350 (1981)).[36]

There are numerous disputed factual questions on this issue. It appears that plaintiff did consider raising capital in 1989 and 1990 through an offering of $150 million in preferred stock, but that it elected not to go forward with the offering due to a perceived lack of investor interest. *See* Def. App. v.5 at 4502–03; *id.* v.3 at 2364. Plaintiff did exchange convertible subordinated debentures for approximately $39 million in common stock in 1989, enabling it to comply with capital requirements. *Id.* v.3 at 2364. Plaintiff's and defendant's respective experts disagree sharply on the feasibility of raising capital through issuances of stock during the period immediately following the breach.

*Compare* Def.App. v.5 at 3696–97 *with id.* at 4280. Defendant's expert, Dr. William Schwert, notes that some thrifts did raise capital in late 1989 and in 1990 and contends that the equity sales in the thrift industry during this period were consistent with other industries. Def.App. v.5 at 4280–85. Plaintiff's expert, Jean–Luc Servat, states that capital markets were "effectively closed" to thrifts attempting to raise capital, although he acknowledges that an offering of nonconvertible, non-cumulative preferred stock with a yield of 13% or more might have been successful. *Id.* at 3696–97. There is nothing in the record which permits the court to determine whether such an offering represented such unfavorable terms that it could not be considered a "reasonable" opportunity to mitigate damages. *See Sun Cal,* 25 Cl.Ct. at 432. Additionally, defendant notes that plaintiff did raise some equity capital in 1992 and 1993 and argues that plaintiff failed to mitigate with respect to the remainder of its damages. Def. Mot. at 84–85. Plaintiff responds that its ability to raise a limited amount of capital in 1992 does not require the fact finder to conclude that it could have raised enough capital to mitigate all of its damages at that time. Pl. Response at 97. The disputes between the experts regarding whether plaintiff could raise capital on commercially reasonable terms at the relevant times preclude summary judgment for defendant on the question of mitigation.

For the foregoing reasons, defendant's Motion for Summary Judgment with regard to its defense of failure to mitigate is DENIED.

### H. Prejudgment Interest

The Complaint asks for interest on all of plaintiff's damages. Defendant moves to dismiss this request under Rule 12(b)(4) for failure to state a claim on which relief can be granted, arguing that the United States must explicitly waive its sovereign immunity with respect to prejudgment interest before plaintiff can recover such interest, and that the United States has not done so. RCFC

---

**36.** California has adopted a similar test, *see Davies v. Krasna,* 14 Cal.3d 502, 121 Cal.Rptr. 705, 535 P.2d 1161, 1169 (1975), so the court would apply the same standard whether federal or California law applies. *See* section B.3.c *supra* (discussion of choice-of-law clause in Assistance Agreement).

12(b)(4); Defendant's Motion to Dismiss (Def.Mot.Dism.) at 22–24. Plaintiff argues that were it granted compensation under the takings clause, it would also be entitled to prejudgment interest on that claim. Pl. Response at 103. The court agrees. However, as discussed in subsection I *infra*, the court finds that plaintiff may not recover on a takings claim. Plaintiff also contests the constitutionality of the contract remedy itself, arguing that the "contract remedy fails to provide the just compensation mandated by the Takings Clause." Pl. Response at 104.

 Congress has provided for this court to award interest on a contract suit against the United States only if the contract explicitly so provides. 28 U.S.C. § 2516(a). It has long been established, as defendant points out, that the United States will not pay prejudgment interest on claims against it absent clear congressional intent to permit such recovery. Def. Mot. Dism. at 22; *see, e.g., Library of Congress v. Shaw*, 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award."); *Smyth v. United States*, 302 U.S. 329, 353, 58 S.Ct. 248, 82 L.Ed. 294 (1937) ("[I]n the absence of contract or statute evincing a contrary intention, interest does not run upon claims against the Government."); *United States ex rel. Angarica De La Rua v. Bayard*, 127 U.S. 251, 260, 8 S.Ct. 1156, 32 L.Ed. 159 (1888) ("It has been established as a general rule, in the practice of the government, that interest is not allowed on claims against it, whether such claims originate in contract or in tort."); *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 798 (Fed. Cir.1993) ("[I]nterest may not be recovered against the government in the absence of an explicit waiver of sovereign immunity for that purpose."). Takings cases are an exception. In condemnation actions, the right to

"just compensation" under the Takings Clause has been interpreted as including prejudgment interest.[37] *Shoshone Tribe v. United States*, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *United States v. Rogers*, 255 U.S. 163, 169–70, 41 S.Ct. 281, 65 L.Ed. 566 (1921).

 With very limited exceptions, as defendant argues, the Supreme Court has held that the United States is immune from suit except insofar as it consents to be sued. Def. Mot. Dism. at 23; *Shaw*, 478 U.S. 310, 315, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The Supreme Court has stated that " '[a]part from constitutional requirements, in the absence of specific provision by contract or statute, or express consent . . . by Congress, interest does not run on a claim against the United States.' " *Shaw*, 478 U.S. at 317, 106 S.Ct. 2957 (quoting *United States v. Louisiana*, 446 U.S. 253, 264–65, 100 S.Ct. 1618, 64 L.Ed.2d 196 (1980)). The only "constitutional requirement" that the Court in *Shaw* found to require an exception to the no-interest rule was the requirement of "just compensation" in the takings context. *Id.* at 317 n. 5, 106 S.Ct. 2957; *see also Loeffler v. Frank*, 486 U.S. 549, 553, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) (applying *Shaw* ). Plaintiff has suggested no authorities which would justify the court's ignoring the authorities cited by defendant.

For the foregoing reasons, defendant's Motion to Dismiss is GRANTED with respect to plaintiff's request for prejudgment interest.

### I. Takings Claim

Defendant's Motion to Dismiss also addresses Count II of plaintiff's Complaint, which alleges that defendant deprived plaintiff of property without just compensation in violation of the Fifth Amendment to the U.S. Constitution. Def. Mot. Dism. at 6; Complaint ¶ 84; U.S. Const. amend. V. Defen-

---

**37.** There is at least one further exception to the rule against assessing interest against the United States outside a takings context. When the government assumes the role of a private commercial enterprise, it may be required to pay interest on claims brought against it in that capacity.

*Standard Oil Co. v. United States*, 267 U.S. 76, 79, 45 S.Ct. 211, 69 L.Ed. 519 (1925). That exception is not relevant here, however, since defendant's contract with plaintiff arose in the context of defendant's regulatory powers.

dant moved to dismiss Count II for failure to state a claim upon which relief may be granted under Rule 12(b)(4).[38] RCFC 12(b)(4); Def. Mot. Dism. at 6.

Dismissal under Rule 12(b)(4) is appropriate "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir.2000); RCFC 12(b)(4). A court considering a motion to dismiss under Rule 12(b)(4) "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the nonmovant's] favor." *Boyle*, 200 F.3d at 1372; RCFC 12(b)(4). Defendant argues that property rights that are created by a contract are governed by the contract and may not be recovered on a takings claim, while plaintiff asserts that "investment-backed expectations" may be considered property subject to a takings claim regardless of whether such expectations are created by a contract. Def. Mot. Dism. at 7–8; Pl. Response at 99.

■ When the government acts as a contractor, its breaches of contract are governed by contract law. *Winstar*, 518 U.S. at 895, 116 S.Ct. 2432 (plurality opinion of Souter, J.) (quoting *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)). Numerous courts have rejected attempts to classify deprivations of property rights created by contract as takings. In *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978), for example, the court found that "the concept of a taking as a compensable claim theory has limited application" to contractual rights and that "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Id.* at 818.[39] *See also Scan–Tech Sec., L.P. v. United States*, 46 Fed.Cl. 326, 341 (2000) ("When the Government asserts its interest in property obtained pursuant to a valid contract, no taking occurs and no obligation arises under

the Fifth Amendment to compensate the contracting party."); *Sunrise Village Mobile Home Park, L.C. v. United States*, 42 Fed.Cl. 392, 404 (1998) ("[I]f the government's actions allegedly breached a contract, the appropriate remedy is a breach of contract claim, not a claim for compensation pursuant to the Takings Clause."). This court has recognized a takings claim despite the existence of a contract with the government when the scope of the takings claim differed from that of the contract claim. *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 34 (1998) (finding that "the rights regarding the subject materials were not contemplated by the parties and reduced to writing" in the contract), *appeal docketed*, No. 01–5003 (Fed.Cir. Oct. 17, 2000). Here, however, the property allegedly taken—the permission to credit the capital contribution to regulatory capital—is identical to the subject of the contract. *See also Buse Timber & Sales, Inc. v. United States*, 45 Fed.Cl. 258, 263 (1999) (distinguishing *Integrated Logistics* on the basis that "the express terms of the contract define the parties' respective rights and responsibilities which address the eventualities at issue"); *Medina Constr., Ltd. v. United States*, 43 Fed.Cl. 537, 560 (1999) (distinguishing *Integrated Logistics* on grounds that Medina's takings claim was "not independent of the contractual events also underlying its pleaded CDA claim").

■ Plaintiff argues that it has a "reasonable, investment-backed expectation" that protects its interests under the Assistance Agreement and permits it to maintain a takings claim. Pl. Response at 99. But such an expectation, even assuming it exists here, does not itself make a takings claim appropriate. Plaintiff's reliance on *Lynch v. United States* is misplaced. In *Lynch*, the Supreme Court referred briefly to the takings clause of the Fifth Amendment but went on

---

**38.** Defendant filed its Motion to Dismiss on September 14, 1999. The court orally stayed all proceedings on the Motion to Dismiss on September 29, 1999. Pl.App. v.4 at 2760–61. In a telephonic status conference on the record on August 3, 2000, the parties agreed to address the subject of the Motion to Dismiss in their then upcoming briefing. Transcript of August 3, 2000 Status Conference at 45–47.

**39.** Plaintiff argues that the treatment of the takings question in *Sun Oil* is *dicta* because recovery on the contract claim had been allowed. Pl. Response at 102; *see* 572 F.2d at 818. Even if the takings discussion in *Sun Oil* can be read as *dicta*, the court finds it instructive for and consistent with the court's resolution of this case.

to discuss the abrogation of the contracts at issue in terms of the due process clause, under which Lynch had sued. 292 U.S. at 579, 54 S.Ct. 840 ("the due process clause prohibits the United States from annulling" the contracts). Moreover, the decision in *Lynch* turned on statutory interpretation and the doctrine of sovereign immunity rather than takings law. While the government contended that it had withdrawn its consent to be sued when Congress had abrogated the contracts, the Court interpreted the statute as preserving the remedy. *Id.* at 575, 586, 54 S.Ct. 840. The Court raised but did not discuss the possibility that the abrogation of the contracts would violate the Fifth Amendment. *Id.* at 584–88, 54 S.Ct. at 846–47. The court finds *Lynch* inapposite to the disposition of this case.

In this case, defendant has conceded the existence of a contract. This proceeding addresses the extent of plaintiff's damages under the contract. Def. Response to Pl. Motion for Entry of Judgment at 2–3; Def. Mot. at 6–8. The court is being asked to put the plaintiff in the position it would have occupied had the contract been fully performed. *See generally Wells Fargo,* 88 F.3d at 1020. Plaintiff appears to acknowledge this when it concedes that "if in this case an adequate contract remedy is provided, it would have no remaining claim under the Takings Clause." Pl. Response at 102. The determination of the amount of plaintiff's expectancy damages in this case, and whether the plaintiff considers that amount "adequate," does not decide whether plaintiff has a takings claim. If, at the conclusion of this proceeding, this court enters judgment for damages in an amount plaintiff finds inadequate, plaintiff will have the remedy of appeal.

For the foregoing reasons, defendant's Motion to Dismiss with respect to Count II of the Complaint is GRANTED. Count II is dismissed with prejudice. Accordingly, the court does not address plaintiff's arguments regarding whether its rights under the contract are in fact property for purposes of the takings clause.

### J. Due Process

Defendant's Motion to Dismiss also addresses Count III of the Complaint, which alleges deprivation of property without due process in violation of the Fifth Amendment. Complaint ¶ 86; Def. Mot. Dism. at 20–21. Defendant has moved to dismiss Count III for lack of subject matter jurisdiction under Rule 12(b)(1). Def. Mot. Dism. at 5, 21. Plaintiff concedes that it is not entitled to recover on this claim in this court. Pl. Response at 104. Defendant's Motion to Dismiss with respect to Count III is therefore GRANTED. Count III is dismissed with prejudice.

### III. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is GRANTED with respect to the following issues: (a) the duration of plaintiff's capital credit; (b) the nature of the breaching act (to the extent stated in section II.D); and (c) plaintiff's wounded bank damages as such damages related to plaintiff's cost of deposits. Defendant's Motion for Summary Judgment is DENIED in all other respects.

Plaintiff's Motion for Summary Judgment is GRANTED on the issue of foreseeability, and DENIED on the issue of the duration of plaintiff's capital credit.

Defendant's Motion to Dismiss Counts II and III of the Complaint and to dismiss plaintiff's claim to prejudgment interest on all of its damages is GRANTED.

IT IS SO ORDERED.

### APPENDIX A

Plaintiff has filed two motions to strike documents in defendant's appendix to its motion for summary judgment on damages (defendant's appendix). Plaintiff initially moved, on September 14, 2000, to strike a total of 73 documents comprising some 761 pages from volumes 1–6 of the appendix for purposes of the pending cross-motions for summary judgment. Following the filing of defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, accompanied by volume 7 of defendant's appendix, plaintiff moved, on October 6, 2000, to strike an additional six documents comprising some 152 pages from volume 7 of the

appendix. Because the two motions raise substantially the same issues, the court will consider them together.

 The types of evidence that may be submitted in support of summary judgment filings include affidavits, depositions, live testimony at the hearing on the motion, answers to interrogatories, and "[a]ny other evidence that would be admissible at trial." Rules of the United States Court of Federal Claims (RCFC) Appendix H(1)(e); RCFC 56(c). Evidence introduced in support of a motion for summary judgment need not, however, be submitted in a form that would be admissible at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party need not demonstrate the admissibility of "every piece of evidence supporting factual assertions" in summary judgment proceedings. *Cedar Lumber, Inc. v. United States,* 857 F.2d 765, 769 (Fed.Cir.1988). Courts, however, must exclude evidence that "would apparently not be admissible at trial." 857 F.2d at 769 (emphasis omitted).

The parties have stipulated to the authenticity of all the documents at issue here, as follows:

All documents (other than handwritten notes) produced in discovery by any party in a *Winstar*-related case are presumed to be authentic, so long as the document bears an identification number pursuant to the Master Protective Order; however, any party may challenge this presumption with respect to a particular document for good cause shown.... Nothing in this stipulation shall be construed as an agreement concerning the admissibility of any document at trial, or an agreement concerning the applicability of any Rule of Evidence other than the Rules governing authenticity of documents.

Appendix to Plaintiff's Motion to Strike (Pl. First Mot.App.) at 166. It is true, of course, that authentic documents may nonetheless be inadmissible on a variety of grounds, *see Air*

*Land Forwarders, Inc. v. United States,* 38 Fed.Cl. 547, 555 (1997), *aff'd,* 172 F.3d 1338 (Fed.Cir.1999), but the stipulation does eliminate any requirement that the parties supply independent foundational evidence to show that the documents are what they appear to be. Moreover, in the case of several hearsay objections that plaintiff raises, the foundational requirements so closely mirror the elements of an exclusion from or an exception to the hearsay rule that stipulating to the documents' authenticity largely establishes their admissibility under the hearsay rules. *See* Fed.R.Evid. 801(d)(2)(D), 803(6), 803(8).

 In particular, documents 1, 3–4, 6–8, 11–15, 17–20, 35–36, 40–42, 48, 54–57, 60–62, 69, and 70, and portions of document 9,[40] as identified in the first motion to strike, and documents 1 and 5 as identified in the second motion to strike, were all created by government agencies. Some were created by the Federal Home Loan Bank Board (FHLBB), some by the Federal Savings and Loan Insurance Corporation (FSLIC), and others by the Office for the Thrift Supervision (OTS), the successor to FHLBB and FSLIC. *See* Plaintiff's Motion Pursuant to Rule 56 and Appendix H of the Rules of the Court of Federal Claims: (1) to Strike Documents in Defendant's Appendix to its Motion for Summary Judgment that would Not be Admissible at Trial; and (2) to Strike Specific Portions of Defendant's Brief in Support of its Motion for Summary Judgment on Damages Because They Rely on Evidence that would Not be Admissible at Trial, filed on September 14, 2000 (Pl. First Mot.); Plaintiff's Motion to Strike Inadmissible Hearsay from Defendant's September 27, 2000 Appendix and Reply Brief, filed on October 6, 2000 (Pl. Second Mot.). Defendant argues that these documents qualify for the "public records" hearsay exception, Fed.R.Evid. 803(8), while plaintiff argues that defendant has not satisfied the requirements of that exception. Defendant's Opposition to Plaintiff's [First] Motion to Strike (Def. Opp. First Mot.) at 11–13; Pl. First Mot. at 15–16. The public records exception deems admissible the following:

**40.** Document 9 as identified in plaintiff's first motion to strike consists of correspondence between FHLBB and Statesman Bank for Savings (Statesman). Pages 1130–34 and 1138–54 appear to be letters from FHLBB to Statesman and are therefore within the scope of this discussion. Pages 1125–29, 1135–37, and 1155–63 are discussed separately.

(8) Public records and reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8). The parties' stipulation to the authenticity of government-created documents largely resolves the question of their admissibility, since the rule shifts the burden of demonstrating "lack of trustworthiness" to the opponent of the evidence once it is established that the evidence is in fact a public record. *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir.1992); *see also* Fed.R.Evid. 803(8) advisory committee's note (the rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present"). Several of the documents, specifically documents 3, 4, 6, 8, 9, and 10 as identified in the first motion to strike, *see* Pl. First Mot. at 5–6, constitute statements of FHLBB or FSLIC policy and, given their authenticity, are admissible under subsection A of Rule 803(8) as statements of the activities of the agency.[41] Several other documents, specifically documents 1, 7, 11–15, 29, 36, 48, 54, 55, 57, and 62, as identified in plaintiff's first motion to strike, *see* Pl. First Mot. at 5–9, and document 1, as identified in plaintiff's second motion to strike, *see* Pl. Second Mot. at 2–4, are government officials' internal memoranda, and likewise are admissible as setting forth the activities of the agency. Documents 17–20, as identified in the first motion to strike, *see* Pl. First Mot. at 6, and document 5, as identified in the second motion to strike, *see* Pl. Second Mot. at 8, are assistance agreements and accompanying documents between the government and institutions other than plaintiff which, since they set forth the activities of the agency, are admissible. Several other documents, specifically documents 35, 36, 40–42, 56, 60, 69, and 70, as identified in the first motion to strike, *see* Pl. First Mot. at 7–9, are the government's assessments of plaintiff or other entities and are therefore admissible under Rule 803(8)(B) as "matters observed pursuant to a duty imposed by law." Fed.R.Evid. 803(8)(B). Document 61, as identified in the first motion to strike, *see* Pl. First Mot. at 9, is admissible under Rule 803(8)(C) as a report of factual findings resulting from an investigation. Fed.R.Evid. 803(8)(C).

Defendant argues that all of the documents that the court has found admissible under the public records exception to the hearsay rule, along with other documents not created by the government, are also admissible under the "business records" exception. Def. Opp. First Mot. at 7–10. The exception provides that the following hearsay statements are admissible:

---

**41.** Document 10 is an article written by Robert Pomeranz and published by FHLBB. Plaintiff argues in its brief on the merits that Mr. Pomeranz may not testify in this case, since he apparently was not initially identified as a person with discoverable information and cannot testify at trial (unless defendant makes him available for deposition). Plaintiff's Opposition to Defendant's Motion for Summary Judgment on Damages and Plaintiff's Cross–Motion for Partial Summary Judgment at 26 n. 11. Defendant states in its reply that it was not aware of Mr. Pomeranz's knowledge relevant to this case until after the close of fact discovery. Defendant's Reply Memorandum in Support of its Motions for Summary Judgment on Damages and in Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment at 32 n. 13. Plaintiff has not moved to strike the article identified as document 10 in the first motion to strike on the grounds of defendant's failure to name Mr. Pomeranz as a person with discoverable information, however. Plaintiff's sole formal objection to Mr. Pomeranz's statements was raised under Rule 803 of the Federal Rules of Evidence, a hearsay objection as to which availability of the declarant is immaterial. Accordingly, Mr. Pomeranz need not be called to testify at trial for the statements in the article to be admitted. Defendant's failure to name Mr. Pomeranz as a person with discoverable information does not render document 10 inadmissible for purposes of the present summary judgment motions.

(6) Records of regularly conducted activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid. 803(6). Defendant has submitted the affidavit of Yvonne Pollard, an employee of OTS, that attests that numerous records meet the various elements of the "business records" exception. *See* Def. Opp. exh. 1. With regard to the documents created by OTS, Ms. Pollard's affidavit provides an alternative basis for admission of hearsay statements.[42] *See id.* But Ms. Pollard's testimony cannot secure the admission as business records of various documents created by plaintiff and other institutions, since she was not an employee of plaintiff or the other institutions and therefore was not in a position to testify about their recordkeeping practices. The documents created by plaintiff that are enumerated in its motion to strike are the following: documents 21–27, 30–34, 37–39, 45, 47, 51–53, 58, 63, 67, 71, and 72, as identified in the first motion to strike. Pl. First Mot. at 6–9.

The "business records" exception has been invoked to justify the admission of records even when the witness providing foundational information is not an employee of the entity that created the records. *See, e.g., Air Land Forwarders, Inc. v. United States,* 172 F.3d

1338, 1344–45 (Fed.Cir.1999); *Saks Int'l, Inc. v. M/V "Export Champion",* 817 F.2d 1011, 1013 (2d Cir.1987). In those cases, however, the courts required a showing that it was the regular practice of the witness's office or agency to gather and rely on the records. *See Air Land Forwarders,* 172 F.3d at 1344 (testimony regarding the original preparation of the documents "is not necessary where an organization ... relied upon those records in its day-to-day operations"); *Saks,* 817 F.2d at 1014 (noting that "it is the customary course of business in the cargo trade for shore-side stevedores to prepare loading tallies and for the ship to retain them and to rely on them"); *see also United States v. Mendel,* 746 F.2d 155, 166 (2d Cir.1984) (admitting into evidence report prepared by slaughterhouse based on foundational evidence supplied by USDA employee, when report was created on USDA's form, completed at its request, and was the type of information regularly used by USDA in making decisions). The witness must also establish that there are "other circumstances indicating the trustworthiness of the document." *Air Land Forwarders,* 172 F.3d at 1343. Ms. Pollard does not state in her affidavit that OTS regularly relied on the records it received from outside parties. Def. Opp. exh. 1. Nor has defendant argued that the records contain independent indicia of trustworthiness. In *Air Land Forwarders,* the individuals preparing the records were subject to criminal penalties if the records were inaccurate. 172 F.3d at 1343–44. Defendant here has made no showing that the records created by parties other than OTS have similar indicia of reliability. Def. Opp. at 7–11. The documents created by plaintiff and other institutions are not admissible as business records.

The documents created by plaintiff are, however, admissible as party admissions. The relevant exception to the hearsay rule provides that a statement offered against a party is not hearsay if it is "a statement by the party's agent or servant concerning a

---

**42.** Ms. Pollard cannot, however, attest to the record-keeping procedures of the OTS's predecessor agencies absent a showing that she has sufficient knowledge to testify regarding those agencies' practices. Since the court has already

found that the documents created by OTS's predecessor agencies are admissible under the public records exception to the hearsay rule, the court does not address the admissibility of those documents under the business records exception.

matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). If the documents purport to be representations on behalf of plaintiff to other entities (documents 24, 26, 27, 34, 37–38, 47, 51, and 71 as identified in the first motion to strike, *see* Pl. First Mot. at 6–9), then establishing that they are what they purport to be also establishes that they were statements by agents or employees of plaintiff regarding matters about which the authors were competent to testify. The stipulated authenticity of the documents therefore largely establishes their admissibility, since plaintiff has given the court no reason to believe that plaintiff's employees were making representations that were outside the scope of their employment to OTS or other entities, or that the representations were not made during the existence of the employment relationship. Part of the document identified as document 3 in the second motion to strike, specifically the part appearing at page 5131 of volume 7 of the appendix to Defendant's Motion for Summary Judgment, also falls within this category.[43] Pl. Second Mot. at 6.

Likewise, if the documents are internal memoranda (documents 21–23, 25, 30–33, 39, 45, 52, 53, 58, 63, 67, and 72 as identified in the first motion to strike, *see* Pl. First Mot. at 6–9, and documents 2 and 4 as identified in the second motion to strike,[44] *see* Pl. Second Mot. at 4–8) and are authentic, the court must assume that they were created by employees of plaintiff and that they deal with matters within the scope of the authors' employment since nothing on the face of the documents suggests otherwise. Moreover, the parties agreed that each party could

challenge the presumption of authenticity with respect to any specific document "for good cause shown," and the court has been shown no "good cause" for challenging that presumption with respect to these documents. Pl. First Mot.App. at 166.

Also admissible as party admissions are documents 43 and 46, as identified in the first motion to strike, *see* Pl. First Mot. at 8, and document 6 as identified in the second motion to strike, *see* Pl. Second Mot. at 8–9, which appear to be reports from Goldman Sachs & Co. (Goldman Sachs) to plaintiff concerning aspects of plaintiff's business. Pl. First Mot. at 8; Pl. Second Mot. at 8–9. Since it appears from the face of those documents that the statements by Goldman Sachs were made in its capacity as plaintiff's agent during the course of the relationship between Goldman Sachs and plaintiff, concerned matters within the purview of that relationship, and were stipulated as authentic, they are admissible under Rule 801(d)(2)(D). *See* Def. App. v.4 at 3365–70; *id.* at 3435–54; *id.* v.7 at 5870–71. Also admissible as party admissions are documents 49 and 50, as identified in the first motion to strike, *see* Pl. First Mot. at 8, which appear to be statements produced by plaintiff's external auditor in the course of its investigation. *See* Def.App. v.4 at 3496–99.

Several other documents challenged in the first motion to strike fall within the "market reports" exception to the hearsay rule, which provides that "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations" are admissible. Fed.R.Evid. 803(17). Plaintiff has withdrawn its objec-

---

**43.** The first part of document 3, as identified in the second motion to strike, *see* Pl. Second Mot. at 6, however, specifically the part of that document appearing at page 5130 of volume 7 of the appendix to Defendant's Motion for Summary Judgment, is not includible within this category, since it is not clear from the face of the document who prepared it.

**44.** Document 2, as identified in the second motion to strike, *see* Pl. Second Mot. at 4–6, is an internal memorandum from one of plaintiff's vice presidents to another. Def.App. v.7 at 5049. Attached to the memorandum are several docu-

ments, namely a forbearance letter, various Thrift Financial Reports (TFR), and instructions appended to the TFRs. *Id.* v.7 at 5050–71. Plaintiff argues that the attachments are inadmissible hearsay. Pl. Second Mot. to Strike at 4–6. The forbearance letter and the instructions appended to the TFRs are documents setting forth the activities of government agencies and are therefore admissible under the public records exception to the hearsay rule. Fed.R.Evid. 803(8). The statements on the TFRs are plaintiff's representations to government agencies and are therefore admissible as party admissions. Fed.R.Evid. 801(d)(2).

tions to documents 64–66, as identified in the first motion to strike. *See* Plaintiff's Reply Brief in Support of [First] Motion to Strike Pursuant to Rule 56 and Appendix H (Pl. Reply First Mot.) at 9. Plaintiff continues to object to documents 59 and 73, as identified in the first motion to strike, *see* Pl. Reply First Mot. at 9, on grounds that those documents are "evaluative and subjective materials" rather than objective compilations of data. Courts have admitted subjective and evaluative materials under the "market reports" exception in some circumstances where there are independent indicia of trustworthiness. *See, e.g., Hamilton v. Accu–Tek,* 32 F.Supp.2d 47, 64 n. 11 (E.D.N.Y.1998) (admitting Dun & Bradstreet reports on grounds that those reports were prepared for use in financial industries rather than in anticipation of litigation); *Kuper v. Quantum Chemicals Corp.,* 852 F.Supp. 1389, 1398 n. 4 (S.D.Ohio 1994) (admitting third party reports encouraging purchase of stock); *see also Weinstein's Federal Evidence* § 803.22[3] (4th ed. 1994) ("Whether each [publication] meets the requisite standard for trustworthiness entitling it to hearsay exemption must be determined on a case by case basis."). Particularly relevant in determining trustworthiness for a given publication is "general reliance by the public or by a particular segment of it," along with "the motivation of the compiler to foster reliance by being accurate." Fed.R.Evid. 803(17) advisory committee's note.

Documents 28, 59, and 73, as identified in the first motion to strike, *see* Pl. First Mot. at 7, 9, consist of articles from various newspapers and magazines. The article included as document 73, reprinted from the Wall Street Journal, reports stockholder lawsuits against plaintiff and another thrift. Def.App. v.6 at 4890. While reporting of this kind is less objective than unadorned lists of numbers reflecting rises and falls in the market, the subjective aspect is minimal in this case. The article neither evaluates the news nor makes investment recommendations based on its reporting. *Id.* The advisory committee's note on Rule 803(17) includes newspaper reports as publications that may qualify

for the exception. Fed.R.Evid. 803(17) advisory committee's note; *see also United States v. Anderson,* 532 F.2d 1218, 1225 (9th Cir.1976) (noting use of Wall Street Journal in context of Rule 803(17) as publication that is "accepted as trustworthy"). *White Indus., Inc. v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1069 (W.D.Mo.1985) (noting that "the kinds of publications contemplated by the rule are those which deal with compilations of relatively straightforward objective facts not requiring, for their statement, a subjective analysis of other facts" and including " 'market reports in newspapers' " as an example of evidence that is admissible under the rule) (quoting 4 Weinstein & Berger, Weinstein's Evidence 803–175 (1984)). Accordingly, even though defendant has introduced no independent evidence that Wall Street Journal articles are sources generally relied upon in the market, the court finds it likely that document 73 will be admissible at trial and deems it admissible for purposes of summary judgment. Similarly, document 28, an article from the Los Angeles Business Journal, is straightforward reporting, and is admissible under the "market reports" exception notwithstanding defendant's failure to adduce independent foundational evidence. Def. App. v.4 at 3148. The hearsay statements attributed to plaintiff's employee that are included within document 28 are admissible as party admissions, moreover, since they address matters that appear to be within the scope of his employment. The employee quoted was the senior vice president of lending, and his remarks are confined to the topic of loan originations. *Id.* Document 59, however, consists of three articles that appear to contain more evaluation than reporting. In those articles, the authors assess the impact of the recession on the thrift industry in light of market activity by various thrifts, including plaintiff. *Id.* v.5 at 3609–19. The highly subjective nature of these assessments, combined with defendant's failure to provide independent evidence that the articles are of a kind generally relied upon in the relevant segments of the public, weigh against admitting this document on summary judgment. Defendant is, of course, free to attempt to introduce the document in any further proceedings where it may be relevant.

Documents 2 and 44, as identified in the first motion to strike, *see* Pl. First Mot. at 5, 8, are assessments of plaintiff by third parties. Document 2 consists almost entirely of an interview between a Smith Barney employee and plaintiff's CEO, Ray Martin, and adds only a brief summary of the interview, a statistical summary of plaintiff's performance, and a map showing the locations of plaintiff's branches, along with a recommendation that the reader purchase plaintiff's stock. Def.App. v.1 at 670–87. Third party reports on investment opportunities may be admissible under the "market reports" exception to the hearsay rule. *See Kuper,* 852 F.Supp. at 1398 n. 4. While defendant has not included a separate affidavit addressing whether Smith Barney in particular is a source generally relied upon in thrift investing, the minimally evaluative nature of the piece leads the court to hold that document 2 is admissible. Def.App. v.1 at 670–87. The statements within document 2 by plaintiff's CEO are admissible as party admissions since they deal with the viability and profitability of the company, which appear to be matters within the scope of Mr. Martin's employment. *Id.* at 675–86. Document 44, however, is a published evaluation of plaintiff conducted by First Boston that includes a substantial amount of interpretation and evaluation along with its reporting. Def.App. v.4 at 3371–87. Like document 59, discussed above, the absence of information that might shed light on whether First Boston publications are generally relied upon in the thrift market, combined with the highly subjective nature of the document, takes document 44 outside the confines of Rule 803(17) and renders it inadmissible for the truth of the statements it contains for purposes of defendant's summary judgment motion. *Id.*

Finally, documents 5, 16, and 68, and portions of document 9, as identified in the first motion to strike, *see* Pl. First Mot. at 5, 6, 9, and the first half of document 3, as identified in the second motion to strike, *see* Pl. Second Mot. at 6, are hearsay and are apparently not admissible for the truth of the matters they contain under any of the above exceptions. *See* Fed.R.Evid. 801(c) (defining hearsay as an out-of-court statement "offered to prove the truth of the matter asserted"); Fed. R.Evid. 802 ("[h]earsay is not admissible except as provided under these rules"). Document 5 and the portions of document 9 appearing on pages 1125–29, 1135–37, and 1155–63 of volume 2 of defendant's appendix, are letters from representatives of two banks, Transohio Savings Bank and Statesman, to FHLBB officials. Def.App. v.2 at 1109–14, 1125–29, 1135–37, 1155–63. The letters appear to have been prepared in the course of the writers' business, since they address the content and interpretation of the assistance agreements between FHLBB and Transohio and Statesman, but nothing on the face of the documents satisfies the various foundational requirements of the business records exception as set out in Rule 803(6). *Id.* None of the writers says anything in the letters to indicate either that they were created in the course of a regularly conducted business activity or that it was the regular practice of the business to create such letters. *Id.* Ms. Pollard testified that the documents were maintained among OTS records, but there is no evidence, inside or outside the documents, regarding whether the government regularly relied on documents similar to those, or providing any independent indicia of the letters' reliability. Document 5 and the relevant portions of document 9 are therefore inadmissible for the truth of the matters asserted. To the extent defendant cites those documents for purposes other than the truth of the matters asserted—for instance, as evidence of the author's state of mind, or as evidence that disagreement or uncertainty was expressed about the proper reporting procedure with respect to the SM–1 forbearance under GAAP—they are admissible.

Document 16 appears to be an outline of a presentation made by John Binkly, a partner in the accounting firm Coopers & Lybrand, in 1987. Def.App. v.2 at 1498–1514. Nothing in the record suggests that Mr. Binkly or Coopers & Lybrand was plaintiff's agent for purposes of the party admission exception, and nothing on the face of the document suggests any of the foundational information relevant to the business records exception. *Id.* Document 16 appears to be hearsay, and

it does not qualify for any of the exceptions to the hearsay rule.

Document 68 appears to be several excerpts from the annual reports of American Savings Bank for 1992, 1993, and 1994. Def. App. v.6 at 4697–4702. Here, nothing on the face of the document shows that it was prepared by a person with knowledge of American Savings Bank's affairs, that it was prepared in the course of a regularly conducted business activity, or that it was the bank's regular practice to create such reports. *Id.* Document 68 appears to be hearsay, and it does not qualify for any of the exceptions to the hearsay rule.

Finally, the portion of document 3, as identified in the second motion to strike, *see* Pl. Second Mot. at 6, that is set out on page 5130 of volume 7 of defendant's appendix is inadmissible because it is impossible to tell what it is. The page contains a graphical chart and is entitled "Loan Origination by Property Type." Def.App. v.7 at 5130. Neither of the parties nor any other entity is mentioned. *Id.* The preparer of the document is not identified. *Id.* Testimony regarding the origin of the document is therefore necessary for it to be admitted under any exception to the hearsay rule.

Documents 5, 16, 44, 59, and 68, and the portion of document 9 appearing on pages 1125–29, 1135–37, and 1155–63 of volume 2 of defendant's appendix, as identified in the first motion to strike, and the portion of document 3 identified in the second motion to strike and appearing on page 5130 of volume 7 of defendant's appendix, are therefore inadmissible for the truth of the statements contained therein for purposes of defendant's motion for summary judgment. Plaintiff's motions to strike are therefore GRANTED with respect to those documents insofar as they are offered for the truth of the matters asserted therein, and DENIED in all other respects.

Plaintiff's first motion to strike also includes a request to strike specific portions of defendant's brief in support of its motion for summary judgment because they rely on evidence that would not be admissible at trial.

Having granted in part and denied in part plaintiff's request to strike documents and having taken those rulings into account in the foregoing opinion and order on the parties' cross-motions for summary judgment, the court DENIES plaintiff's motion to strike specific portions of defendant's brief.